RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0256p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

AMY JO HICKS (17-5206); LINDA BLACKBURN (17-5211); WILLIE OUSLEY, on behalf of the Estate of Patricia L. Ousley (17-5212); CHERRIE JUSTICE (17-5213); LEAH ANN JENKINS (17-5214); SHELIA DARLENE ADAMS (17-5215); ROY G. HALE, JR. (17-5216),

     *Plaintiffs-Appellees*,


JOHN LEE PERKINS (17-5598); CAROLYN GRIFFITH, TIMOTHY L. HOWARD, and ROBERT MARTIN (17-5614),

     *Plaintiffs-Appellants*,


  *v.*


COMMISSIONER OF SOCIAL SECURITY,

     *Defendant-Appellant*
(17-5206 / 5211 / 5212 / 5213 / 5214 / 5215 / 5216),

     *Defendant-Appellee* (17-5598 / 5614).

Nos. 17-5206 / 5211 / 5212 / 5213 / 5214 / 5215 / 5216 / 5598 / 5614

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.

No. 7:16-cv-35—Joseph M. Hood, District Judge.

Nos. 7:16-cv-51; 7:16-cv-101; 7:16-cv-111—Danny C. Reeves, District Judge.

Nos. 7:16-cv-53; 7:16-cv-64; 7:16-cv-89; 7:16-cv-95; 7:16-cv-106;
7:16-cv-115; 7:16-cv-154—Amul R. Thapar, District Judge.

Argued:  March 7, 2018

Decided and Filed:  November 21, 2018

Before:  MOORE, GIBBONS, and ROGERS, Circuit Judges.

---

**COUNSEL**

---

**ARGUED:** Thomas Pulham, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for the Commissioner of Social Security. Arpit K. Garg, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Plaintiffs. **ON BRIEF:** Thomas Pulham, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for the Commissioner of Social Security. Arpit K. Garg, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., Ned Pillersdorf, PILLERSDORF, DEROSSETT & LANE, Prestonburg, Kentucky, Evan B. Smith, APPALACHIAN CITIZENS' LAW CENTER, Whitesburg, Kentucky, Charnel M. Burton, APPALACHIAN RESEARCH AND DEFENSE FUND OF KENTUCKY, INC., Hazard, Kentucky, Francis E. Budde, MORGAN & MORGAN, Atlanta, Georgia, Kelly L. Ward Wallen, APPALACHIAN RESEARCH AND DEFENSE FUND, Prestonsburg, Kentucky, for Plaintiffs. Charles L. Martin, MARTIN & JONES, Decatur, Georgia, for Amicus Curiae.

MOORE, J., delivered the opinion of the court in which GIBBONS, J., joined, and ROGERS, J., joined in Part II.C. ROGERS, J. (pp. 33–52), delivered a separate dissenting opinion.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. When individuals in this country are unable to work because of physical or mental disabilities, they may file for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits. The eleven plaintiffs here all filed for these benefits, and they all eventually received them. The trouble, however, is that they were represented in their efforts by Eric Conn, a Kentucky attorney who secured benefits for his clients by submitting fraudulent reports to the Social Security Administration ("SSA"). An Administrative Law Judge ("ALJ"), David Daugherty, also participated in the scheme by taking bribes from Conn to assign Conn's cases to himself and issue favorable rulings.

Nearly ten years after the SSA first learned of Conn's and Daugherty's possible wrongdoings, it initiated efforts to "redetermine" plaintiffs' eligibility for benefits. The SSA held new hearings before new ALJs to determine plaintiffs' entitlement to benefits as of the date

of their original applications—i.e., seven to ten years earlier. During the redetermination process, the SSA disregarded all medical evidence submitted by the four doctors participating in Conn's scheme on the ground that such evidence was tainted by fraud. Plaintiffs had no opportunity to rebut the agency's assertion of fraud as to this medical evidence. Ultimately, all plaintiffs were deemed ineligible for SSDI and SSI benefits as of the date of their original applications, and their benefits were terminated. After exhausting all administrative remedies, plaintiffs brought suit in federal district court.

The eleven cases presented in this consolidated appeal appeared before three different district judges. Though the precise nature of their claims somewhat varied, all plaintiffs alleged that the SSA's procedures and actions violated the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act ("APA"), and the Social Security Act. We now hold that the plaintiffs are entitled to summary judgment on their due-process claim, the SSA is entitled to summary judgment on plaintiffs' claims under the Social Security Act, and the SSA is not entitled to summary judgment on plaintiffs' claims under the APA. We therefore **AFFIRM** the district court's judgment in cases numbered 17-5206, 17-5211, 17-5212, 17-5213, 17-5214, 17-5215, 17-5216, and **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion in cases numbered 17-5598 and 17-5614.

## I. BACKGROUND

The SSDI and SSI programs provide disability benefits to individuals with physical or mental impairments that preclude them from working. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The eleven plaintiffs in this consolidated appeal had each applied for SSDI and/or SSI benefits between June 2006 and October 2008, and their applications were initially denied. Either before or after these initial denials, each plaintiff retained Eric Conn, a Kentucky attorney, to assist with the application process. With Conn's counsel, each plaintiff then submitted a timely request for a hearing before an ALJ. In each of these cases, the plaintiff's application included medical records from one of four examining doctors—Bradley Adkins, Ph.D., Srinivas Ammisetty, M.D., Frederic Huffnagle, M.D., or David P. Herr, D.O. And in each of these cases, ALJ David Daugherty relied exclusively on the doctors' medical opinions to

conclude on the record (i.e., without holding a hearing) that plaintiffs were disabled and thereby entitled to either SSI or SSDI benefits. In particular, in each case Daugherty's discussion of his determination to award benefits read, more-or-less verbatim, as follows:

> Having considered all of the evidence, I am satisfied that the information provided by Dr. [Adkins, Ammisetty, Huffnagle, or Herr] most accurately reflects the claimant's impairments and limitations. Therefore, the claimant is limited to less than sedentary work at best.

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible.

*E.g.*, 16-cv-53 (Blackburn), R. 26-1 (Ex. 6A, Daugherty Decision at 3) (Page ID #281).

According to the SSA, plaintiffs' change of fortune was not coincidental. Instead, SSA alleges that Conn, Daugherty, and the four doctors identified above were engaged in a wide-spread scheme to secure SSI and SSDI benefits for Conn's clients based on fraudulent disability applications. SSA Br. at 12–15. The scheme, according to the SSA, worked like this: Conn created a limited number of template Residual Functional Capacity ("RFC") forms, which he or attorneys in his office filled out ahead of time. *Id.* at 13. These forms, which are normally meant to convey a claimant's "ability to do work-related activities on a day-to-day basis in a regular work setting," 16-cv-154 (Hicks), R. 42-2 (Adkins Report, RFC Form) (Page ID #1438), were purportedly manipulated to ensure that they satisfied the SSA's criteria for establishing a disability. *Id.* The doctors above then signed these forms without making any adjustments, and Conn submitted the forms to the SSA on behalf of his clients. *Id.* Daugherty, who was allegedly receiving bribes from Conn, then assigned Conn's cases to himself and issued favorable rulings to Conn's clients. *Id.* at 14–15; Pls. Br. at 4.

The SSA first learned about possible wrongdoing involving Daugherty and Conn as far back as 2006, when a senior case technician and a master docket clerk in the SSA's Office of Disability Adjudication and Review (which houses the ALJs) raised concerns that Daugherty was reassigning Conn's cases to himself and rapidly deciding them in the claimants' favor. *U.S. ex rel. Griffith v. Conn*, No. CIV. 11-157-ART, 2015 WL 779047, at *1–2 (E.D. Ky. Feb. 24,

2015).  A Wall Street Journal article published in May 2011 highlighted Daugherty's practice of taking Conn's cases and awarding benefits and noted that "[a] possible connection between Messrs. Daugherty and Conn is a subject of the inspector general's investigation."  Damian Paletta, *Disability-Claim Judge Has Trouble Saying "No,"* Wall St. J., May 19, 2011.  Also in 2011, the U.S. Senate Committee on Homeland Security and Governmental Affairs launched an investigation into Daugherty's unusually quick adjudication of disability claims and unusually high rate of granting benefits.  The Committee issued a report in October 2013 finding that "Judge Daugherty worked with Mr. Conn in inappropriate ways to approve a high volume of cases submitted by the Conn Law Firm."  Senate Committee on Homeland Security and Governmental Affairs, *How Some Legal, Medical, and Judicial Professionals Abused Social Security Disability Programs for the Country's Most Vulnerable: A Case Study of the Conn Law Firm* 5 (Oct. 7, 2013) [hereinafter, Senate Report], available at https://www.hsgac.senate.gov/imo/media/doc/REPORT%20Conn%20case%20history%20report -final%20%20(10-7-13).pdf.

After the Wall Street Journal article was published, but before the SSA took any steps to initiate redetermination proceedings in these cases, Conn purportedly made significant efforts to destroy records, "including medical records for active disability claims."  *Id.* at 121.  According to the Senate Report, a shredding company sent Conn an invoice on June 23, 2011 for the destruction of more than 26.5 thousand pounds of documents for the Conn Law Firm, which is, according to the Report, the equivalent of 2.65 million sheets of paper.  *Id.* at 122.  Before the article, the shredding company had previously shred documents for Conn in smaller batches (e.g., 5.6 thousand pounds of paper in June 2010; 5.9 thousand pounds of paper in September 2010; and 7.3 thousand pounds of paper in November 2010).  *Id.*  An affidavit submitted by a former Conn Law Firm employee in one of the cases below confirms that medical records "were destroyed by fire or by shredding, although not all medical records were destroyed."  16-cv-154 (Hicks), R. 22-1 (Slone Aff. ¶ 3) (Page ID #1082).  This former employee also averred that "[i]t was routine practice in Mr. Conn's office not to submit any medical records to Social Security or the Office of Disability Adjudication and Review on a claimant's claim once they were assigned to Judge David B. Daugherty."  *Id.*

By July 2014, the Social Security Administration's Office of the Inspector General ("OIG") had identified 1,787 individuals—all of whom had been represented by Conn—whose applications, the OIG "had reason to believe," were tainted by fraud. 16-cv-154 (Hicks), R. 10-1 (OIG Letter) (Page ID #146). This tag has statutory significance. Under the Social Security Act, the SSA is required to "immediately redetermine" a beneficiary's entitlement to disability benefits if, at any point after granting benefits, the SSA has "reason to believe that fraud or similar fault was involved in the application" for benefits. 42 U.S.C. § 405(u)(1)(A). The SSA may, however, delay redetermination proceedings if "a [state or federal prosecutor] with jurisdiction over potential or actual related criminal cases, certifies, in writing, that there is a substantial risk that such action by the Commissioner of Social Security with regard to beneficiaries in a particular investigation would jeopardize the criminal prosecution of a person involved in a suspected fraud." *Id.* Notwithstanding the SSA's clear statutory mandate to "immediately redetermine" benefits upon suspicion of fraud, *id.*, the OIG provided the 1,787 names to the SSA "with the understanding that SSA was not to take any adverse action against any individual on the list until further notice." 16-cv-154 (Hicks), R. 10-1 (OIG Letter) (Page ID #146).

On May 12, 2015, the OIG sent the SSA another letter stating that the OIG "still has[] reason to believe" that fraud was involved in the 1,787 applications identified in July 2014. *Id.* In particular, the OIG explained that it "has[] reason to believe that Mr. Conn or his firm submitted pre-completed 'template' Residual Functional Capacity forms purportedly from [the four doctors identified above], dated between January 2007 and May 2011, in support of the individuals' applications for benefits." *Id.* The OIG noted that it was "not aware of any objections to SSA moving forward with its administrative processing of the redeterminations of the 1,787 individuals" previously identified by the OIG and told the SSA "that it may proceed with its redetermination of the cases of the individuals on the previously transmitted list." *Id.*

With that, the SSA sent letters on May 18, 2015 to each of the eleven plaintiffs in this case (along with approximately 1,500 other individuals, *see* 16-cv-154 (Hicks), R. 25-1 (Salzmann Aff. ¶ 5) (Page ID #1125)). Citing sections 205(u) and 1631(e)(7) of the Social Security Act (42 U.S.C. §§ 405(u), 1383(e)(7)(A)), the letters explained that the SSA needed to

redetermine plaintiffs' eligibility for benefits because "there was reason to believe fraud was involved in certain cases involving [Adkins, Ammisetty, Huffnagle, and Herr]," one or more of these doctors "provided evidence" in plaintiffs' cases, and the ALJ (i.e., Daugherty) "previously used that evidence to find [plaintiffs] disabled." *E.g.*, 16-cv-154 (Hicks), R. 20-4 (Notice of Appeals Council Action at 1) (Page ID #339). The letters further explained that during the redetermination process, the SSA "must disregard any evidence from one of the medical providers above when the information was submitted by representative Eric C. Conn or other representatives associated with Mr. Conn's law office." *Id.*

According to the May 18, 2015 letters, the SSA had already reviewed plaintiffs' cases (less than a week after receiving notice from the OIG that it could proceed with the redetermination process) and had concluded that the remaining evidence in plaintiffs' files did not support their favorable benefits determinations. *Id.* at 2 (Page ID #340). As a result, the plaintiffs' cases were being remanded to a new ALJ for a redetermination hearing. *Id.* The letters informed plaintiffs that they could obtain representation for the hearing and could submit more evidence to the ALJ, which the SSA would consider so long as it was "new and material" and concerned plaintiffs' disabilities on or before the date of Daugherty's initial decision. *Id.* at 3–4 (Page ID #341–42). In an affidavit submitted in the *Hicks* district court proceedings, a division chief administrative appeals judge explained that beneficiaries may also receive assistance, if they request it, "with developing records that are new, material, and related to the period at issue" during the redetermination process. 16-cv-154 (Hicks), R. 25-1 (Salzmann Aff. ¶ 6) (Page ID #1125). In addition, "the ALJ may obtain medical or vocational expert testimony as necessary." *Id.*

The SSA held new hearings in plaintiffs' cases between December 2015 and March 2016. In each hearing, the new ALJ disregarded the medical reports initially submitted by Adkins, Ammisetty, Huffnagle, or Herr, considered all other medical evidence in plaintiffs' files, including newly submitted evidence that satisfied the two criteria above, and concluded that plaintiffs should not have been awarded benefits in the first place. *E.g.*, 16-cv-53 (Blackburn), R. 26-1 (Redetermination Decision at 13–25) (Page ID #212–24). The ALJs therefore "terminated" plaintiffs' benefits and informed plaintiffs that the "SSA may treat any benefits

previously received as an overpayment." *Id.* at 24 (Page ID #223). The ALJs further instructed plaintiffs that they "have the right to file a new application at any time." *Id.* at 11 (Page ID #210).

Notably, in redetermining plaintiffs' eligibility for benefits, the SSA excluded all evidence submitted by Adkins, Ammisetty, Huffnagle, and Herr—not just the RFC forms that the OIG had identified as possibly fraudulent in its referral to the SSA.[1] *See* 16-cv-154 (Hicks), R. 10-1 (OIG Letter) (Page ID #146). Beyond the RFC forms, the four doctors had submitted evidence detailing their examinations of plaintiffs, including any testing that they had performed and behavioral observations they had made. For Hicks, for instance, Dr. Adkins submitted a report stating that he had examined Hicks for three-and-a-half hours and had administered a third-edition Wechsler Adult Intelligence Scale test ("WAIS-III"). 16-cv-154 (Hicks), R. 42-2 (Adkins Report at 1) (Page ID #1429). Adkins determined that Hicks had an IQ of 69 and a Global Assessment of Functioning ("GAF") score of 47. *Id.* at 6, 8 (Page ID #1434, 1436). No other IQ testing appears in Hicks's records, and the only other GAF score discussed in the ALJ's redetermination decision was higher (65–70), and had been obtained by an SSA-retained physician. 16-cv-154 (Hicks), R. 20-3 (Redetermination Decision at 20) (Page ID #254). Without the benefit of Adkins's report, the ALJ concluded that Hicks's "medically determinable mental impairment causes no more than 'mild' limitation" and therefore "did not significantly limit [her] ability to perform basic work activities." *Id.* at 21–22 (Page ID #255–56).

After exhausting their administrative remedies, plaintiffs sought relief in federal district court. Plaintiffs challenged the SSA's procedures, actions, and decisions as violations of the Social Security Act, the Due Process Clause of the Fifth Amendment, and the Administrative Procedure Act. *See, e.g.*, 16-cv-154 (Hicks), R. 1 (Compl. ¶¶ 11–20) (Page ID #3–4). Seven of the cases proceeded before Judge Thapar (Hicks, Adams, Blackburn, Hale, Jenkins, Justice, and

---

[1]The SSA now alleges, based on a statement attached to the plea agreement that Conn recently signed in his criminal prosecution, that Conn's "fabrication of evidence was not limited to RFC forms." SSA Br. at 13. According to Conn's plea agreement, Adkins also exaggerated the length of his evaluations and estimated claimants' IQs rather than administering proper IQ tests. 17-cr-43, R. 9-1 (Factual Basis Statement ¶ 7) (Page ID #36). The OIG did not mention (and perhaps did not know about) these non-RFC examples of fraudulent behavior in its letter referring plaintiffs' cases to the SSA for redetermination. 16-cv-154 (Hicks), R. 10-1 (OIG Letter) (Page ID #146).

Ousley), which are referred to collectively here as *Hicks v. Colvin*; three cases proceeded before Judge Reeves (Griffith, Howard, and Martin) and were decided together under the name *Carter v. Colvin*; and one case proceeded before Judge Hood (*Perkins v. Colvin*).

Judge Thapar focused first on Hicks, where he decided the constitutional due-process claim in Hicks's favor and granted partial summary judgment to Hicks on that ground on October 12, 2016. 16-cv-154 (Hicks), R. 36 (Mem. Op. & Order) (Page ID #1328–60). He then issued an order in each of the other six cases applying the *Hicks* opinion to them. *E.g.*, 16-cv-53 (Blackburn), R. 39 (Order) (Page ID #854–55). The SSA moved for reconsideration of the *Hicks* opinion, which Judge Thapar denied on December 21, 2016. 16-cv-154 (Hicks), R. 48 (Mem. Op. & Order) (Page ID #1608–21). In the meantime, Judge Reeves rejected plaintiffs' statutory and constitutional claims regarding the SSA's redetermination procedures in *Carter* and granted partial summary judgment to the SSA on November 15, 2016.[2] *E.g.*, 16-cv-101 (Griffith), R. 43 (Mem. Op. & Order) (Page ID #950–89). Judge Hood largely adopted Judge Reeves's opinion and granted partial summary judgment to the SSA in *Perkins* on December 16, 2016. 16-cv-35 (Perkins), R. 55 (Mem. Op. & Order) (Page ID #1489–98). The SSA filed a notice of appeal in the seven cases proceeding before Judge Thapar on February 21, 2017. *E.g.*, 16-cv-154 (Hicks), R. 57 (Notice of Appeal) (Page ID #1658–59). The remaining four plaintiffs obtained leave to appeal Judge Reeves's and Judge Hood's interlocutory orders granting partial summary judgment to the SSA on May 24, 2017. *E.g.,* 16-cv-35 (Perkins), R. 70 (Order) (Page ID #1653–56). This appeal followed.

## II. DISCUSSION

### A. Due Process

Plaintiffs' due-process challenge focuses on the SSA's refusal to accord them an opportunity to rebut the OIG's assertion of fraud as to the Conn-related medical reports. Pls. Br. at 17. A preliminary question in this case is whether the three-factor balancing test laid out in

---

[2]The plaintiffs in *Carter* also alleged that the SSA's redeterminations were not supported by substantial evidence. That claim was not the subject of the SSA's motions for summary judgment. *E.g.*, 16-cv-101 (Griffith), R. 43 (Mem. Op. & Order at 14) (Page ID #963).

*Mathews v. Eldridge*, 424 U.S. 319 (1976), governs this due-process claim.  As a plurality of the Supreme Court explained in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004),

> *Mathews* dictates that the process due in any given instance is determined by weighing "the private interest that will be affected by the official action" against the Government's asserted interest, "including the function involved" and the burdens the Government would face in providing greater process.  The *Mathews* calculus then contemplates a judicious balancing of these concerns, through an analysis of "the risk of an erroneous deprivation" of the private interest if the process were reduced and the "probable value, if any, of additional or substitute procedural safeguards."

*Id.* at 529 (quoting *Mathews*, 424 U.S. at 335).

Plaintiffs argue that this is "a case about the minimum protections of due process," and *Mathews*—which plaintiffs understand as a test "used to determine whether *additional* process (i.e., beyond the minimum) is required"—does not apply.  Pls. Br. at 32.  In particular, plaintiffs insist that "procedural due process" requires, at a minimum, "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker," and this baseline procedural protection may not be "balanced away."  *Id.* at 19 (quoting *Hamdi*, 542 U.S. at 533).  The SSA, in turn, insists that the Supreme Court and this court have long applied *Mathews* to assess whether the government has provided "the core due process protection of a meaningful hearing," SSA Reply Br. at 9, and that the district court in *Hicks* erred in delineating a "formal" test for the base requirements of procedural due process and a "functional" test for everything else, SSA Br. at 47–48.  We conclude that plaintiffs have the better argument, and hold that the SSA's procedures violate long-standing principles of procedural due process that predate the *Mathews* test.  Even under *Mathews*, however, plaintiffs would prevail.

### 1. Minimum Due-Process Analysis

Long before *Mathews*, the Supreme Court recognized the "immutable" principle that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496 (1959).  Both in *Mathews* and subsequently, the Court has reaffirmed this basic

tenet. *See Mathews*, 424 U.S. at 346 (holding that the SSA's process for terminating disability benefits satisfies constitutional due-process requirements because beneficiaries are able "to challenge directly the accuracy of information in [their] file[s] as well as the correctness of the agency's tentative conclusions"); *see also Hamdi*, 542 U.S. at 533 (plurality) ("[A] citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."); *id.* at 553 (Souter, J., joined by Ginsburg, J., concurring in relevant part) ("[S]omeone in [the defendant's] position is entitled at a minimum to notice of the Government's claimed factual basis for holding him, and to a fair chance to rebut it before a neutral decisionmaker."); *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003) ("[D]ue process require[s] the government to accord the plaintiff a hearing to prove or disprove a particular fact or set of facts . . . . [that are] relevant to the inquiry at hand."). As the government's action in this case "depends on fact findings" that the plaintiffs have not been provided the opportunity to rebut, the government's process is constitutionally inadequate. *See Greene*, 360 U.S. at 496.

The SSA argues, in effect, that the deprivation of plaintiffs' benefits in this case did not "depend on" the government's finding that the reports by Conn's doctors involved fraud, *see id.*, because it turned instead on the government's finding that the other evidence in the plaintiffs' records was insufficient to establish disability. SSA Br. at 44. An agency's determination, however, "depends on fact findings" beyond the ultimate factual question at issue, and due process protects a person's right to contest not only the final finding, but also the relevant preliminary findings. *See Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) ("Only when the *whole proceedings* leading to the pinning of an unsavory label on a person are aired can oppressive results be prevented." (emphasis added)); *cf. United States v. Davis*, 928 F.2d 405, 1991 WL 37829, at *4 (6th Cir. 1991) ("[D]ue process in sentencing demands that 'the defendant be given the opportunity to rebut factors that might enhance a sentence.'" (quoting *United States v. Castellanos*, 904 F.2d 1490, 1495 (11th Cir. 1990))). The final factual decision is the product of preliminary factual findings. When a party is improperly handicapped in disputing a preliminary issue, the overall outcome is also tainted.

Moreover, in this consolidated appeal, the exclusion of the Conn-related medical reports is inextricably bound up with the denial of plaintiffs' benefits because, according to plaintiffs, they are now unable to provide sufficient substitute evidence of their initial eligibility for benefits. *See* Pls. Br. at 28–29. Perhaps plaintiffs would not have received a favorable outcome if their initial medical records were considered in the redetermination process, *id.* at 25—after all, the ALJ deciding the initial review was hardly neutral—but inclusion of these reports nevertheless constitutes plaintiffs' only hope of restoring their benefits, *id.* at 28–29. To preclude plaintiffs from contesting the fraudulent nature of the reports would be akin to allowing Hamdi (the plaintiff in *Hamdi* who had been held in Guantanamo as an "enemy combatant" solely on the say-so of a U.S. government memorandum) to contest that he was an "enemy combatant" but not that he was captured on the battlefield in Afghanistan. If the latter fact more-or-less decides the former, then due process requires that both remain up for debate. *See Hamdi*, 542 U.S. at 526 (plurality) (holding that Hamdi cannot be deemed to have conceded that he was captured in a combat zone because he was not "permitted to speak for himself or even through counsel as to those circumstances" (citation omitted)).

According to the SSA, "the potential value of the excluded report" is irrelevant because "the 'right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions.'" SSA Br. at 45 (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). The SSA's reliance on *Scheffer* is misplaced. There, the Court determined that the military could exclude polygraph evidence from court-martial proceedings because such evidence lacked "sufficient scientific acceptability to be relevant." *United States v. Scheffer*, 523 U.S. 303, 307 (1998) (citation omitted). *Scheffer* therefore concerned a blanket prohibition on certain forms of evidence; this case, by contrast, concerns a particularized determination that aspects of plaintiffs' records are tainted by fraud—precisely the sort of adjudicative factual determination that requires a hearing to sort out. *See Londoner v. City & Cty. of Denver*, 210 U.S. 373, 385–86 (1908). The dissent minimizes the way in which this particularized determination distinguishes our case from *Scheffer*, but it is meaningful. *See* Dissent at 45. With individualized determinations comes a risk of individualized evaluative error on the part of the SSA reviewer,

the kind plaintiffs are entitled to dispute. No such risk of individualized error is posed by the blanket nature of the polygraph evidence prohibition in *Scheffer*.

Even if *Scheffer* were a relevant precedent, it offers no support for the SSA's contention that "the potential value of the excluded report" is irrelevant. Rather, *Scheffer* recognized that even generally applicable evidentiary rules may "raise a constitutional concern" if they "implicate a sufficiently weighty interest of the [plaintiff]." 523 U.S. at 309. Thus, a state rule banning "all hypnotically refreshed testimony" must bend when a "defendant, accused of a killing to which she was the only eyewitness, was allegedly able to remember the facts of the killing only after having her memory hypnotically refreshed," as a contrary holding would "deprive[] the jury of the testimony of the only witness who was at the scene and had firsthand knowledge of the facts" and would "infringe[] upon the defendant's interest in testifying in her own defense." *Id.* at 315 (discussing *Rock v. Arkansas*, 483 U.S. 44 (1987)). By the same token, refusing to allow plaintiffs here to present the only persuasive evidence of their earlier eligibility for disability benefits "implicate[s] a sufficiently weighty interest of the [plaintiffs] to raise a constitutional concern." *Id.* at 309. The dissent fails to address possible constitutional limitations on evidentiary rules. *See* Dissent at 45. Of course, this does not mean that the SSA must allow plaintiffs to rely on fraudulent evidence in their redetermination hearings. But it does mean that the SSA must proffer some factual basis for believing that the plaintiffs' evidence is fraudulent, and the plaintiffs must have an opportunity to "rebut the Government's factual assertions before a neutral decisionmaker." *See Hamdi*, 542 U.S. at 533.

### 2. Due-Process Analysis under *Mathews*

Applying the *Mathews* test leads to the same result. *Mathews* directs courts to weigh the private interest in a property right against the government's interest in avoiding additional or substitute process, in light of "the risk of an erroneous deprivation" of a property holder's interest "and the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. *Mathews'*s balancing, however, is not suspended in space; it operates against a constitutional bottom. As the D.C. Circuit once put it,

> [d]epending upon the tilt of the *Mathews* balance in a particular case, . . . the timing and content of the [required] hearing may vary. Nevertheless, however weighty the governmental interest may be in a given case, the amount of process required can never be reduced to zero—that is, the government is never relieved of its duty to provide *some* notice and *some* opportunity to be heard prior to final deprivation of a property interest.

*Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991) (internal citations omitted). We therefore see *Mathews* less as a three-way see-saw, and more as a two-step template.

First, courts must consider when, in *Mathews*'s parlance, the "risk of an erroneous deprivation" is too high. At some foundational level, this factor is dispositive. After all, "*some* form of hearing is required before an individual is finally deprived of a property interest," *Mathews*, 424 U.S. at 333 (emphasis added), no matter how small the interest or how great the governmental burden. Next, after establishing the base level of process owed, courts must weigh the remaining factors to determine how much more ought to be provided. Where the liberty or property interest is significant and the cost to the government of providing additional, valuable process is low, then greater procedures must be implemented. Where the liberty or property interest is relatively low, the value of additional procedures is minimal, and the cost to the government is high, then nothing more is necessary.

This is essentially how a plurality of the Supreme Court approached the *Mathews* test in *Hamdi*. The plurality first noted the strong interests at stake both for Hamdi and the government, *Hamdi*, 542 U.S. at 529–32, concluded that the "risk of an erroneous deprivation" became intolerable if Hamdi was deprived of "notice of the factual basis for his classification [as an enemy combatant] and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker," *id.* at 533, and then considered what additional procedures, beyond the "core elements" already identified, would be necessary to protect Hamdi's interest, in light of the significance of Hamdi's interest, the probable value of additional safeguards, and the national security risks associated with implementing them, *id.* at 533–35. Ultimately, the plurality determined that little more than the constitutional minimum was necessary. *Id.* The evidentiary standards and burdens associated with criminal trials, while presumably valuable in avoiding

erroneous deprivations of liberty, were not worth the national security cost. *Id.* at 533–34. The *Hamdi* plurality decision therefore guides courts on both the proper application of *Mathews* and the base level of protection it must provide—i.e., "notice of the factual basis" for a governmental determination and "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Id.* at 533.

Applying *Mathews* here, we conclude that the risk of an erroneous deprivation under the SSA's current framework is too high. The SSA argues that the current process leaves little room for error, as plaintiffs may rely on a host of other evidence beyond the Conn-related medical reports, including evidence that was not submitted in the initial determination, and the Conn-related reports would, in any event, be a low-weighted factor in the ALJ's analysis. SSA Br. at 35–43. But Supreme Court precedent, including precedent applying *Mathews*, indicates that any time a citizen is deprived of "notice of the factual basis" for a governmental determination and "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker," the risk of error is too high. *Hamdi*, 542 U.S. at 533; *see also Wilkinson v. Austin*, 545 U.S. 209, 225–26 (2005) (holding that Ohio's process for assigning prisoners to maximum-security prisons was constitutional because the state gave inmates "notice of the factual basis leading to consideration for [maximum-security-prison] placement and a fair opportunity for rebuttal," and Supreme Court case law "ha[s] consistently observed that these [protections] are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations").

Moreover, even if the risk of an erroneous deprivation were not intolerably high *whenever* claimants are precluded from rebutting material factual assertions about their case, the risk of an erroneous deprivation is nevertheless too high in these cases. Even assuming fraud could be reliably detected through a blanket rule—a point the Supreme Court has previously called into doubt, *see Califano v. Yamasaki*, 442 U.S. 682, 697 (1979) ("We do not see how [social security beneficiaries' "fault" or "good faith"] can be evaluated absent personal contact between the recipient and the person who decides his case.")—the SSA's exclusionary rule is over-expansive. The OIG referral stated only that the OIG had reason to believe that a small portion of the four physicians' reports—the RFC forms—had been fraudulently prepared, 16-cv-154 (Hicks), R. 10-1 (OIG Letter) (Page ID #146), yet the SSA disregarded *any* evidence signed

by Adkins, Ammisetty, Huffnagle, or Herr and submitted by the Conn Law Firm between January 2007 and May 2011, *e.g.*, 16-cv-154 (Hicks), R. 20-4 (Notice of Appeals Council Action at 2) (Page ID #340). The SSA's rule therefore excludes a wide range of materials that the OIG never claimed to have "a reason to believe" were tainted by fraud.

The divergence between the material identified by the OIG and the material excluded by the SSA highlights the danger of the SSA's approach. Not only are the OIG's assertions of fraud unreviewable, but the SSA's application of those assertions is unreviewable. Currently, the SSA asserts that it has "reason to believe" that all reports signed by Adkins, Ammisetty, Huffnagle, and Herr and submitted by Conn between January 2007 and May 2011 contained fraud. But what if the SSA instead declared that all reports signed by the four doctors—regardless of whether they were submitted by Conn—were tainted by fraud? What would preclude the SSA from interpreting the OIG's referral this broadly? In effect, the SSA insists that it may unilaterally select the criteria for fraud (based on vague statutory guidance) and then unilaterally select which evidence satisfies those criteria. With no adversarial input and no judicial oversight, the risk that nonfraudulent material will be erroneously excluded is impermissibly high.[3]

The dissent essentially argues that the "reason to believe" standard is "nearly irrebuttable," and therefore due process affords plaintiffs no entitlement to attempt to rebut it. *See* Dissent at 44. We see things differently. The considerable liberties that the SSA has taken in interpreting and administering the "reason to believe" standard advocate in favor of a procedural check, not against it. In extolling the virtues of the non-adversarial "reason to believe" determination, the dissent draws an analogy to the Supreme Court's approval of a non-adversarial probable cause determination in criminal cases. *See* Dissent at 43 (discussing *Kaley v. United States*, 571 U.S. 320, 338–39 (2014)). Yet in criminal cases the same question underlies the initial probable cause determination and the ultimate issue at trial: whether the

---

[3]This is not to say that a rule excluding only the RFC forms would satisfy due process. For reasons laid out above, such a rule would still deprive plaintiffs of an individualized opportunity to show that material critical to their cases should not be disregarded. But the SSA's actual decision to exclude not just the RFC forms, but also the four doctors' entire medical reports, is even more troubling.

defendant committed the crime. Here, however, the question of whether there is "reason to believe" that materials were tainted by fraud is distinct from the later question of eligibility for benefits. Once the SSA has determined that there is "reason to believe" a possible fraud occurred, access to a class of evidence is forever foreclosed to a beneficiary in his subsequent redetermination hearing. No such negative consequence follows from a non-adversarial finding of probable cause in criminal cases because it "determines only whether adequate grounds exist to proceed to trial and reach that [same] question." *Kaley*, 571 U.S. at 399.

The SSA nevertheless argues that it does not matter much whether nonfraudulent material is wrongly disregarded because the likelihood of a wrongful benefit determination remains low. SSA Br. 38–41. In support, the SSA notes that plaintiffs may submit new evidence showing the same facts as the excluded reports. *Id.* at 38–39. But plaintiffs persuasively argue that this procedural protection may be of little practical value for most claimants affected by Conn's scheme. Conn failed to turn in claimants' medical files once their cases were assigned to Daugherty and then seemingly destroyed a great deal of the files when news of his misconduct began to break, Senate Report at 122; 16-cv-154 (Hicks), R. 22-1 (Slone Aff. ¶ 3) (Page ID #1082), and it is understandably difficult to obtain new evidence of past disability. The SSA notes that plaintiffs did, for the most part, supplement their files with new evidence during the redetermination process. SSA Br. at 39. But simply because they fought on with whatever means remained available does not imply that they were not disadvantaged by their inability to contest the SSA's denial of their use of the reports. For similar reasons, the SSA's claim, which the dissent wholeheartedly embraces, *see* Dissent at 41–42, 44, that the excluded medical reports are relatively insignificant because they were never supposed to receive controlling weight in the benefits determination also fails, *see* SSA Br. at 39–41. Even if the excluded reports would generally not override contrary evidence from treating physicians, *see* 20 C.F.R. § 404.1527(c)(2), they could nevertheless corroborate other evidence in the file and potentially tip the scales toward a favorable determination.

The remaining two *Mathews* factors also favor plaintiffs. The Supreme Court has long recognized that social security disability beneficiaries have a substantial interest in receiving their benefits, as "the hardship imposed upon the erroneously terminated disability recipient may

be significant." *Mathews*, 424 U.S. at 342. Here, plaintiffs provide some evidence as to precisely how significant the hardship is: upon losing her benefits, Hicks moved into a camper without a bathroom and signed up for food stamps, and her depression worsened. 16-cv-154 (Hicks), R. 49-1 (Hicks Aff. ¶¶ 2, 4, 6) (Page ID #1629–30). In addition, upon termination of their benefits, plaintiffs became liable for significant overpayment liabilities. *See id.* ¶ 7 (Page ID #1630) (noting Hicks received a letter from the SSA saying that she owes $62,000 in overpayment). SSA contends that plaintiffs could mitigate the hardship associated with losing their benefits by (1) applying for new benefits, and (2) applying for a waiver of overpayment. SSA Br. at 30–31. But, as the district court in *Hicks* noted, "filing an entirely new application or defending past payments is itself a burden," 16-cv-154 (Hicks), R. 36 (Mem. Op. & Order at 24) (Page ID #1351), and three of the plaintiffs' applications for new benefits have already been denied, SSA Reply Br. at 13 n.6. With respect to waivers, the SSA has declined to provide blanket overpayment amnesty to plaintiffs or other Conn clients, which renders the threat of overpayment penalties a distinct and troubling possibility for most plaintiffs. Pls. Br. at 41. (The SSA has approved waiver requests for four plaintiffs, and one plaintiff's overpayment penalty was discharged in bankruptcy. SSA Reply Br. at 13 n.6.) Further, there is a distinct dignitary harm to beneficiaries who are not allowed to effectively dispute the allegation that they have been receiving undeserved benefits for close to ten years, leeching government resources to which they had no right. This harm remains even if overpayment is waived. The dissent trivializes all of the above hardships, *see* Dissent at 36–37, contributing to its skewed *Mathews* balancing.

As to the government's interest in avoiding additional procedures, the SSA's position boils down to arguments about cost and administrative burden. The SSA believes plaintiffs' requested procedure would require an ALJ to hold a hearing in which an OIG agent would "testif[y] about how he came to believe that here was fraud in part of [the plaintiffs'] file[s]," and the plaintiffs would "cross-examine[] the agent and present[] evidence to show why [their medical reports] were all true." SSA Br. at 33 (quoting 16-cv-154 (Hicks), R. 36 (Mem. Op. & Order at 29) (Page ID #1356)). The SSA contends that such a process would be "extraordinarily burdensome" and would "infringe on law enforcement efforts concerning the fraud scheme"

because it would require ALJs to review the sufficiency and merits of the OIG's investigatory efforts. SSA Br. at 33–34. The SSA further argues that additional procedures would frustrate Congress's efforts to ensure that redeterminations occur quickly, as evidenced by the requirement that SSA "immediately redetermine" benefits upon developing a "reason to believe" that fraud was involved in the initial application. *Id.* at 35 (citing 42 U.S.C. § 405(u)).

These arguments are not compelling. We are particularly unpersuaded by the SSA's timing claims, given that the SSA waited nearly ten years after first learning about possible misconduct involving Conn and Daugherty to initiate redetermination proceedings. It seems disingenuous now to claim that plaintiffs should receive fewer procedural protections because the SSA is statutorily obligated to move quickly. Nor do we believe that "forcing OIG investigators to testify in over 1,500 redetermination hearings" would be particularly onerous given that SSA investigators would have to do the same thing if they developed a "reason to believe" fraud existed in 1,500 applications for benefits. *See* SSA Reply Br. at 18; 42 U.S.C. § 405(u). If anything, the burden might be greater on the SSA investigators, as it is more likely that whatever fraud they uncover involves a single beneficiary, *see* SSA Reply Br. at 40, and therefore they would not benefit from the economies of scale that might exist in redeterminations spawned from OIG investigations. The dissent attacks a straw man of "complex evidentiary hearings into wide-ranging fraud schemes" in which "officials [ ] spend inordinate time testifying over and over again about that Inspector General's investigation into the Conn fraud." Dissent at 38. Yet if the application of the "reason to believe" standard is as formulaic as the dissent elsewhere claims, there is no reason such extensive testimony would be required. And although we do hold that the current state of affairs fails to afford beneficiaries due process, we have not mandated the particular ameliorative procedures that the SSA and dissent assume and bemoan. This district court, for example, proposed a considerably less painful adversarial procedure than the travails described by the dissent. *See* 16-cv-154, R. 36 (Mem. Op. and Order at 29) (Page ID #1356). Finally, if the SSA is concerned about interfering with ongoing law enforcement efforts, the SSA may secure a certification, in writing, from a state or federal prosecutor with jurisdiction over the investigations saying that the redeterminations would "jeopardize the criminal prosecution of a person involved in a suspected fraud," and the

redetermination proceedings would halt.  42 U.S.C. § 405(u)(1)(A).  Congress has already told the SSA what to do when redetermination proceedings threaten criminal adjudications, and the answer is not to deprive claimants of basic procedural safeguards.

At bottom, the district court in *Hicks* was right to conclude that refusing to allow plaintiffs to rebut the OIG's assertion of fraud as to their individual applications violates the Due Process Clause of the Fifth Amendment.  We therefore **AFFIRM** the grant of partial summary judgment to plaintiffs in *Hicks* and **REVERSE** the partial grant of summary judgment to the SSA in *Carter* and *Perkins*.

## B.  Administrative Procedure Act ("APA")

Plaintiffs argue that the SSA violated the APA by (1) failing to comply with the APA's requirements concerning formal adjudications and (2) acting in an arbitrary and capricious manner by allowing claimants whose benefit determinations are suspected of fraud by the SSA to rebut assertions of fraud, but denying the same procedural protection to claimants whose benefit-determinations are suspected of fraud by the OIG.  The district courts in *Perkins* and *Carter* rejected these arguments and entered partial summary judgment in the SSA's favor on plaintiffs' APA claims.  We now **REVERSE**.

### 1.  Failure to Comply with the Administrative Procedure Act's Formal-Adjudication Requirements

The APA distinguishes between formal adjudications, which must follow a set of "trial-type procedures," including "notice of 'the matters of fact and law asserted,' an opportunity for 'the submission and consideration of facts [and] arguments,' and an opportunity to submit 'proposed findings and conclusions' or 'exceptions,'" and informal adjudications, which "do not include such elements."  *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655 (1990) (internal citations omitted) (alteration in original).  Section 405(b)(1) of the Social Security Act directs the SSA to make "findings of fact" and "decisions as to the rights of any individual applying" for Social Security payments.  42 U.S.C. § 405(b)(1).  The parties appear to agree that all proceedings under 42 U.S.C. § 405(b)(1) are subject to the APA's formal-adjudication requirements, Pls. Br. at 54–55; SSA Reply Br. at 36—a point we have previously established,

*see Calvin v. Chater*, 73 F.3d 87, 91 (6th Cir. 1996); *Mullen v. Bowen*, 800 F.2d 535, 536 n.1 (6th Cir. 1986) (en banc).[4]  The parties also seem to agree that a redetermination proceeding, which is governed by 42 U.S.C. § 405(u), is a proceeding under 42 U.S.C. § 405(b)(1).[5]  Pls. Reply Br. at 3; SSA Reply Br. at 36–37.  The parties then part ways on two points.  First, plaintiffs contend that the redetermination hearings, which were required to comply with the APA's requirements for formal adjudications, did not in fact do so.  The SSA, in turn, argues that the redetermination hearings necessarily complied with the APA's formal-adjudication requirements because they conformed to 42 U.S.C. § 405(b)(1), and the requirements of § 405(b)(1) and the APA's formal-adjudication provisions are coterminous.  SSA Reply Br. at 36–37.  Second, the SSA insists that plaintiffs' actual challenge is that "they did not receive a hearing on OIG's reason to believe that fraud was involved in the applications for benefits," and plaintiffs' claim therefore must fail because the OIG's fraud determination is not governed by 42 U.S.C. § 405(b) and therefore need not conform to the APA requirements for formal adjudications.  *Id.* at 37–38.

The SSA's first argument is somewhat hard to follow.  If, as the SSA argues, "the protections provided by § 405(b)(1) are co-extensive with the APA's provisions on formal adjudication," SSA Reply Br. at 37, then the SSA's failure to comply with one act amounts to a violation of the other.[6]  And here, plaintiffs have identified at least one way in which the SSA's

---

[4]The dissent, however, argues that we have never held that hearings under § 405(b)(1) are formal adjudications and have only said so in dicta.  *See* Dissent at 47 (discussing *Mullen v. Bowen*, 800 F.2d 535, 536–37 & n.1 (6th Cir. 1986) (en banc)).  Although the SSA noted that the statement was dicta, it did not advance an argument that § 405(b)(1) hearings are not in fact formal adjudications.  *See* SSA Reply Br. at 36.  We therefore do not address such an argument.

[5]The dissent also maintains that redeterminations under § 405(u) are not governed by § 405(b)(1).  Dissent at 47–48.  The SSA has not advanced this argument.  Rather, it maintains that "the redetermination process as implemented by SSA [ ] provides the protections guaranteed by § 405(b)(1)."  *See* SSA Reply Br. at 36–37.  Because the SSA has not made the argument presented by the dissent, we do not entertain it.

[6]The SSA appears to read *Richardson v. Perales*, 402 U.S. 389 (1971), as holding that any procedure that complies with 42 U.S.C. § 405(b) necessarily comports with the APA.  *See* SSA Reply Br. at 37.  But the *Perales* Court actually explained that it "need not decide whether the APA has general application to social security disability claims"—a point this circuit has since decided in the affirmative—because "the social security administrative procedure does not vary from that prescribed by the APA."  *Id.* at 409.  The Court explained that the protections laid out in § 556(d) of the APA "conform, and are consistent with, rather than differ from or supersede, the authority given the Secretary by the Social Security Act[]."  *Id.*  In effect, the Court held that § 405(b)(1)

procedures failed to comply with the APA's formal-adjudication requirements.  In particular, the APA provides that "[w]hen an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary."  5 U.S.C. § 556(e).  This circuit has considered the meaning of § 556(e) in only two cases, both concerning an ALJ's failure to provide "official notice" and an "opportunity to show the contrary" before taking notice of materials outside the record.  *See id.*; *Dixie Fuel Co., LLC v. Dir., Office of Workers' Comp. Programs*, 820 F.3d 833, 846 (6th Cir. 2016); *Baker v. Dir., Office of Workers' Comp. Programs*, 980 F.2d 729, 1992 WL 361287, at \*2 (6th Cir. 1992) (order)).  Both cases noted that the ALJ's failure to comply with § 556 would require reversal of the ALJ's determination and remand for further fact-finding unless the error was harmless.  *Dixie*, 820 F.3d at 846; *Baker*, 1992 WL 361287, at \*2.  As is most relevant here, we held in *Baker* that the ALJ's error was not harmless because the ALJ "essentially rejected the only remaining medical opinion that could have established [the plaintiff's claim]" based, in part, on his assessment of the drafting physician's qualifications, which were not included in the record.  *Baker*, 1992 WL 361287, at \*2.  Similarly, here, plaintiffs have provided evidence demonstrating that the ALJs assigned to plaintiffs' redetermination hearings essentially rejected the only remaining medical opinions that could have established plaintiffs' claims based on the OIG's off-the-record determination that the records involved fraud—determinations plaintiffs had no opportunity to rebut or contest.  The SSA's process therefore fails under the APA.**7**

---

encompasses the protections laid out in, at the very least, 5 U.S.C. § 556(d).  The SSA therefore cannot combat the charge that it failed to comply with the APA by asserting that it complied with 42 U.S.C. § 405(b)(1).  If the SSA shirked its responsibilities under one act, it shirked its same responsibilities under the other.

**7**Plaintiffs raise three additional purported violations of the APA's requirements for formal adjudications.  First, plaintiffs contend that the SSA "imposed" a "sanction" on plaintiffs based on evidence outside the record, in violation of 5 U.S.C. § 556(d), by disregarding portions of plaintiffs' medical records based on the evidence underlying the OIG's fraud assertion, which does not appear in the record.  Pls. Br. at 53–54.  Second, plaintiffs argue that they were barred from "conduct[ing] such cross-examination as may be required for a full and true disclosure of the facts," in violation of § 556(e).  Pls. Br. at 53–54.  Finally, plaintiffs argue that the SSA violated § 554(d)(2), which precludes an ALJ presiding over a redetermination hearing from "be[ing] responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency."  5 U.S.C. § 554(d)(2).  Because we conclude that the SSA violated the APA in at least one way, we need not decide whether these other allegations amount to additional APA violations.  We therefore decline to do so here.

The SSA's second argument—that plaintiffs are actually contesting the OIG's fraud-determination process rather than the benefits-redetermination hearing, SSA Reply Br. at 37–38—fares no better. Plainly, plaintiffs' suit concerns the level of process they were accorded by the SSA in their redetermination hearings, not at the OIG-referral stage. The SSA cannot reframe plaintiffs' complaint to evade responsibility for failing to abide by the APA's requirements. The district courts in *Perkins* and *Carter* therefore erred in granting summary judgment to the SSA on plaintiffs' claims that the SSA's redetermination process violated the APA's formal-adjudication requirements

### 2. Disparate Treatment of Fraud Allegations Based on Originating Source

According to plaintiffs, the SSA also violated the APA's prohibition on "arbitrary" or "capricious" decisionmaking, *see* 5 U.S.C. § 706(2)(A), by adopting different procedures for claimants whose initial-benefits determinations are suspected of fraud by the SSA as opposed to those suspected of fraud by the OIG.[8] Pls. Br. at 57. The SSA's Hearings, Appeals, and Litigation Law Manual ("HALLEX") contemplates three ways in which the SSA could develop a "reason to believe" that fraud was involved in a given application.[9] First, "[a]n SSA

---

[8]The dissent argues that plaintiffs forfeited their arbitrary-and-capricious claim because they did not raise it meaningfully below. *See* Dissent at 50–51. We conclude that the argument was sufficiently raised below to be preserved for appeal because it was not addressed "in a perfunctory manner, unaccompanied by some effort at developed argumentation" and plaintiffs did not merely "mention a possible argument in the most skeletal way." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)). Plaintiffs quoted, juxtaposed, and analyzed the two relevant provisions, and argued that there was no reason why "a beneficiary's evidentiary rights depend on which of the Defendant's employees happen to develop a belief about the beneficiary's award." 16-cv-154 (Hicks), R. 22 (Pl.'s Mot. for Partial Summ. J. and Mem. in Supp. at 27) (Page ID #1076). In another filing, plaintiffs reiterated the argument, cited 5 U.S.C. § 706(2)(A), and argued that such conduct constituted "improper agency action in its own light." 16-cv-35 (Perkins), R. 17-1 (Mem. of Law in Supp. of Mot. for Prelim. Inj. at 12 n.7) (Page ID #287).

[9]In one of the district court proceedings below, the SSA described the relevant HALLEX provisions as "interpretative rules" that "merely restate and interpret [42 U.S.C. §] 1383(e)(7)'s mandate that the agency redetermine eligibility for supplemental security income if there is a reason to believe that fraud was involved in an individual's application, and when redetermining eligibility, disregard evidence if there is reason to believe that fraud was involved in the provision of the evidence." 16-cv-101 (Griffith), R. 33 (Acting Comm'r's Reply in Supp. of Her Partial Mot. to Dismiss Pls.' Compl. at 11) (Page ID #286). Here, we presume that, as the SSA alleges, the provisions at issue are in fact interpretive rules. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1210 (2015) (treating an agency interpretation as an "interpretive rule" because "the parties litigated this suit on [that] understanding").

investigation [could] result[] in a finding of fraud or similar fault." HALLEX I-1-3-25(C)(4)(a). Second, the SSA could receive "[a] referral based on information obtained during a criminal or other law enforcement investigation." *Id.* And third, the OIG—an investigatory division of the Social Security Administration—could refer information to the Commissioner of Social Security. *Id.*; ABOUT THE OIG, https://oig.ssa.gov/about-oig (last visited Aug. 3, 2018). HALLEX directs ALJs conducting redetermination hearings to adopt different procedures depending on which of the above three sources triggered the redetermination. When the SSA alone suspects that a claimant's determination was tainted by fraud, "an adjudicator can consider a beneficiary's or recipient's objection to the disregarding of certain evidence." HALLEX I-1-3-25(C)(4)(a). "[I]f the adjudicator disregards the evidence because a preponderance of the evidence shows that fraud or similar fault was involved in providing the evidence, he or she will address the beneficiary's or recipient's objection in his or her decision." *Id.* If, by contrast, the redetermination is "based on an OIG referral of information or a referral based on information obtained during a criminal or other law enforcement investigation," then "adjudicators do not have discretion to reconsider the issue of whether the identified evidence should be disregarded." *Id.* Plaintiffs allege that granting additional procedures to a subset of claimants based on which agency first suspects fraud is arbitrary and capricious, particularly where, as here, the SSA may actually suspect fraud first but transfer the investigation to the OIG rather than handling the matter itself. Pls. Br. at 58–59.

In response, the SSA argues that it makes sense to treat OIG-based determinations of fraud differently than SSA-based determinations of fraud because adopting plaintiffs' proposed procedure would (1) be unduly burdensome on "both the law enforcement agency and SSA's ALJ corps," as the OIG is more likely than the SSA to conduct large-scale investigations, and therefore more beneficiaries are affected by OIG-based determinations of fraud than SSA-based determinations; (2) "risk interference with the investigation and resulting criminal prosecution"; and (3) "place the ALJs in the untenable position of reviewing the sufficiency of law enforcement efforts." SSA Reply Br. at 40.[10]

---

[10]The SSA argues that plaintiffs forfeited this argument by not raising it below. However, Hicks raised the point in her motion for partial summary judgment. 16-cv-154 (Hicks), R. 22 (Mot. for Partial Summ. J. at 27) (Page

Plainly, the SSA did not include any of the reasons it now offers for treating OIG-based determinations of fraud differently than SSA-based determinations of fraud in HALLEX. "[A]n agency's actions must be upheld, if at all, on the basis articulated by the agency itself," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983), and not based on "appellate counsel's post hoc rationalization[s]," *Comcast Cablevision-Taylor v. NLRB*, 232 F.3d 490, 497 (6th Cir. 2000) (quoting *Flav-O-Rich, Inc. v. N.L.R.B.*, 531 F.2d 358, 362 (6th Cir. 1976)). Although *State Farm*'s ban on post-hoc rationalizations was issued in the context of notice-and-comment rulemaking, the Supreme Court has since made clear that an agency must "articulate a satisfactory explanation for its action" in other circumstances, as well. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *State Farm*, 463 U.S. at 43) (assessing whether the Federal Communication Commission's reasons behind announcing a "new enforcement policy" and "expanding the scope of its enforcement activity" were "rational," *id.* at 517); *see also Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) (noting that the arbitrary-and-capricious standard "requires an agency to provide more substantial justification" when it announces a new interpretive rule based on "factual findings that contradict those which underlay its prior policy" (second quote quoting *Fox Television Stations*, 566 U.S. at 515)).

In any event, even if we were to credit the SSA's post-hoc explanations for distinguishing between OIG- and SSA-based determinations of fraud, its purported justifications are insufficient. All of the SSA's rationales for distinguishing between claimants whose files were deemed fraudulent by the OIG and claimants whose files were deemed fraudulent by SSA turn

---

ID #1076) (noting the distinction between the OIG's fraud assertions and the SSA's fraud assertions and arguing that "[t]here is no statutory or regulatory basis for this distinction. Its arbitrary nature—that a beneficiary's evidentiary rights depend on which of the Defendant's employees happens to develop a belief about the beneficiary's award—itself suggests a due process of Administrative Procedure Act violation." (citing 5 U.S.C. § 706(2)(A))). Perkins raised the same point in a footnote. 16-cv-35 (Perkins), R. 17-1 (Mem. of Law in Supp. of Mot. for Prelim. Inj. at 12 n.7) (Page ID #287) ("To create a dichotomy in how redetermination claims are treated based on the source of the factual allegations is not only arbitrary and capricious, but also unmoored from any law— and thus improper agency action in its own light." (citing 5 U.S.C. § 706(2))). Although true that "an argument is not raised where it is simply noted in a footnote absent any recitation of legal standards or legal authority," *Calvert v. Wilson*, 288 F.3d 823, 836 (6th Cir. 2002), here, plaintiffs raised the point both in the text of one memorandum and in a footnote of another, and in both instances, plaintiffs included citation to the relevant statutory provision. We therefore treat the argument as preserved on appeal.

on differences between the OIG and the SSA—not between the claimants. The SSA has not provided any citations to suggest agencies can distinguish between similarly situated claimants based on circumstances entirely outside their control, and there is good reason to believe such action violates the APA. In *Miller v. Bond*, 641 F.2d 997 (D.C. Cir. 1981), the D.C. Circuit held that the Federal Aviation Administration's ("FAA") sick-leave policy was arbitrary and capricious because the FAA considered not only whether an employee had complied with the written requirements for obtaining sick leave (i.e., submitting a doctor's note), but also whether the employee had provided evidence of "objective symptoms." *Id.* at 1005. The FAA did not notify employees that submitting evidence of "objective symptoms" was necessary for, "or even particularly helpful to, gaining approval of their sick leave requests." *Id.* As a result, "whether a particular employee happened to submit the evidence deemed necessary to qualify for that category became a matter of sheer luck." *Id.* "Decisions based on luck," the D.C. Circuit held, "can only be described as 'arbitrary and capricious,' and therefore invalid." *Id.* The same logic applies here: plaintiffs are not accused of willingly participating in Conn's scheme, such that they could perhaps be deemed responsible for the procedural consequences of triggering an OIG investigation. Instead, they had the misfortune of hiring an attorney whose misconduct was widespread enough to warrant an OIG, as opposed to an SSA, investigation. Procedurally penalizing plaintiffs on this basis is arbitrary and capricious.

We therefore **REVERSE** the district courts' grant of summary judgment in the *Perkins* and *Carter* cases to the SSA on plaintiffs' claims under the APA and **REMAND** for further proceedings consistent with this opinion.

## C. Social Security Act

Plaintiffs allege two violations of the Social Security Act ("the Act"). First, they allege that the SSA violated the Act by redetermining plaintiffs' benefits without first proving that their initial determinations involved fraud, in violation of the SSA's procedures governing reopenings and common-law and statutory principles of res judicata. Second, plaintiffs argue that the SSA violated the Act by failing "immediately" to redetermine plaintiffs' entitlement to benefits, as

required under 42 U.S.C. § 405(u).  On these claims, we affirm the district courts' determinations in *Carter* and *Perkins* to grant summary judgment to the SSA.

### 1. Reopenings and Res Judicata

Turning first to plaintiffs' "reopening" argument:  SSA regulations authorize the SSA to "reopen" a determination of benefits if "[i]t was obtained by fraud or similar fault."  20 C.F.R. § 404.988(c)(1).  The Program Operations Manual System ("POMS") (an internal instruction manual) explains that the SSA will not reopen initial determinations unless there is "a preponderance of evidence to prove the existence of fraud."  POMS § GN 04020.010(B)(2).  The manual continues, "we should not think, suppose, suspect, or speculate that fraud or similar fault exists; we should be able to prove it."  *Id.* § GN04020.010(D)(1).  If, as plaintiffs allege, redeterminations must follow the same procedural requirements as reopenings, then the SSA erred by redetermining plaintiffs' entitlement to benefits based solely on the OIG's conclusion that there was "reason to believe" that fraud was involved in plaintiffs' applications, without establishing proof of fraud by a preponderance of the evidence.

This claim is a nonstarter, as plaintiffs cannot establish that the procedures governing reopenings also govern redeterminations.  Title 42 U.S.C. § 405(u)(1)(A) directs SSA to "redetermine" entitlement to benefits whenever "there is reason to believe that fraud . . . was involved in the application" for benefits.  On its face, then, § 405(u) requires the SSA to redetermine benefits based on something less than proof of fraud.  *Deutsche Bank Nat. Tr. Co. v. Tucker*, 621 F.3d 460, 463 (6th Cir. 2010) ("If the statutory language is unambiguous, 'the judicial inquiry is at an end, and the plain meaning of the text must be enforced.'" (quoting *United States v. Plavcak*, 411 F.3d 655, 661 (6th Cir. 2005)).  Moreover, the SSA has issued a Social Security Ruling explaining that "[f]raud and similar fault determinations under [42 U.S.C. § 405(u)] . . . are distinct from reopenings as described in 20 CFR 404.987–404.996 and 20 CFR 416.1487–416.1494."  Social Security Ruling 16-1p, 81 Fed. Reg. 13,436, 13,436 n.1 (Mar. 14, 2016).  As an interpretation of the reopening regulations, the Social Security Ruling is entitled to

*Auer* deference.[11]   *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2004) (holding that a Social Security Ruling, as "an agency's interpretation of its own regulation[,] is entitled to substantial deference and will be upheld unless plainly erroneous or inconsistent with the regulation") (citing *Auer v. Robbins*, 519 U.S. 452, 561 (1997)).[12]

Plaintiffs' broader res-judicata argument fails for similar reasons.  As plaintiffs note, common-law principles of res judicata generally preclude agencies from readjudicating prior determinations. *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997).  Though plaintiffs concede that agencies may reassess prior determinations tainted by fraud, they argue that agencies must first "'prove the allegations' of fraud."  Pls. Br. at 61 (citing *Restatement (Second) of Judgments* § 70(2)(b)).  Plaintiffs contend that this common-law principle of res judicata was codified by the Social Security Act in 42 U.S.C. § 405(h), which provides that "[t]he findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing," *id.*, and incorporated into the SSA's regulations on reopenings.  Pls. Br. at 61–62.  According to plaintiffs, when Congress enacted § 405(u), it meant to incorporate these preexisting principles of res judicata into the redetermination process. *Id.*

The SSA concedes that res judicata principles apply in the agency setting, but it argues that courts may not "impose rules of preclusion, as a matter of policy, when the interpretation of a statute is at hand.  In this context, the question is not whether administrative estoppel is wise

---

[11]Plaintiffs argue that "*Auer* deference is unwarranted for agency positions 'adopted in response to litigation,'" Pls. Reply Br. at 22–23, but the Supreme Court has not announced such a blanket rule.  It has instead explained that *Auer* deference is "unwarranted when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question,'" which "might occur" when an agency's interpretation "is nothing more than a 'convenient litigating position.'"  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (first quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997); then quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988)).  Here, where the SSA's interpretation accords fully with the statutory text, deference—to the extent deference is even necessary in light of the unambiguous text—is owed.

[12]As Social Security Rulings presumably lack the force of law, they do not warrant *Chevron* deference. *Smith v. Aegon Cos. Pension Plan*, 769 F.3d 922, 927 (6th Cir. 2014).  *Barnhart v. Walton*, 535 U.S. 212 (2002), is not to the contrary.  There, the Court determined that an agency's interpretation of its statute, as announced in "formal regulations," deserved *Chevron* deference, even though the interpretation first appeared in a Social Security Ruling. *Id.* at 219–21.

but whether it is intended by the legislature." SSA Reply Br. at 44 (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991)). According to the SSA, Congress manifested an intent to override background principles of res judicata when it enacted § 405(u). *Id.* We agree. "[C]ourts may take it as given that Congress has legislated with an expectation that the principle [of res judicata] will apply except 'when a statutory purpose to the contrary is evident.'" *Solimino*, 501 U.S. at 108 (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)). "This interpretative presumption is not, however, one that entails a requirement of clear statement, to the effect that Congress must state precisely any intention to overcome the presumption's application to a given statutory scheme." *Id.* Here, Congress plainly intended to authorize reassessments of initial determinations without *proof* of fraud when it directed the SSA to "redetermine the entitlement of individuals . . . if there is *reason to believe* that fraud . . . was involved in the application [for benefits]." 42 U.S.C. § 405(u)(1)(A) (emphasis added). Nothing in the legislative history can override this textual mandate. *See Deutsche Bank Nat. Tr. Co.*, 621 F.3d at 463. The district courts in *Perkins* and *Carter* therefore properly granted the SSA summary judgment on this claim.

## 2. Failure to Act Immediately

In their final claim, plaintiffs argue that the SSA violated the Act by failing to "immediately redetermine" plaintiffs' entitlements to benefits, as required under 42 U.S.C. § 405(u)(1)(A). Plaintiffs contend that the SSA had "reason to believe that fraud . . . was involved in the application[s]" for benefits as far back as 2006, when whistleblowers first disclosed Conn's scheme, and yet failed to begin the redetermination process until 2015. Pls. Br. at 15.

In response, the SSA contends that it complied with § 405(u), as it issued notices to plaintiffs regarding their redetermination hearings within a week of receiving a letter from the OIG stating there were no "objections to SSA moving forward with its administrative processing of the redeterminations" of the applications implicated in Conn's scheme. 16-cv-154 (Hicks), R. 10-1 (OIG Letter) (Page ID #146); SSA Reply Br. at 45–46. As plaintiffs rightly note, however, nothing in § 405(u) permits the SSA to delay redetermination proceedings until it

receives a green light from the OIG. Pls. Reply Br. at 23–24. Section 405(u) directs the SSA to "immediately redetermine" benefits when "there is reason to believe that fraud or similar fault was involved in the application." 42 U.S.C. § 405(u)(1)(A). The SSA had "reason to believe" plaintiffs' applications involved fraud as far back as 2006, when the SSA whistleblowers began raising alarms, and certainly by 2013, when the U.S. Senate issued a 166-page report detailing Conn's and Daugherty's abuses. *See* Senate Report at 4–8. If the SSA believed that they could not proceed with redetermination hearings until the OIG and criminal law-enforcement agents completed their investigations, it should have obtained a certification in writing from a state or federal prosecutor involved in the investigations. 42 U.S.C. § 405(u)(1)(A). The SSA failed to do so, and therefore failed to satisfy its statutory obligations under § 405(u).

Nevertheless, the SSA prevails on this claim. In *United States v. Montalvo-Murillo*, 495 U.S. 711 (1990), the Supreme Court refused to hold that a detainee must be released if the government fails "immediately" to hold a bail hearing "upon the [detainee's] first appearance before the judicial officer," as required under 18 U.S.C. § 3142(f). *Id.* at 714 (citation omitted). As the Supreme Court explained,

> [a] prompt hearing is necessary, and the time limitations of the Act must be followed with care and precision. But the Act is silent on the issue of a remedy for violations of its time limits. Neither the timing requirements nor any other part of the Act can be read to require, or even suggest, that a timing error must result in release of a person who should otherwise be detained.

*Id.* at 716–17. The Supreme Court has since reiterated its position that "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993).

Plaintiffs identify two exceptions to this general principle. First, they note that courts will enforce statutory timing requirements where the requirement is a "condition precedent" to authorizing agency action. Pls. Reply Br. at 26. The Supreme Court, however, has recently construed a statute with similar mandatory language as § 405(u) as not containing a condition precedent. *See State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 137 S. Ct. 436, 440, 443 (2016) (complaint under the False Claims Act need not be dismissed even if relator failed to

abide by requirements that "[t]he complaint *shall* be filed in camera, *shall* remain under seal for at least 60 days, and *shall* not be served on the defendant until the court so orders." (emphasis added)).

Plaintiffs argue that § 405(u) is "functionally identical to statutes in which the Supreme Court has held a condition precedent to be mandatory," Pls. Reply Br. at 26, but the sole case plaintiffs cite in support of this proposition—*Hallstrom v. Tillamook Cty.*, 493 U.S. 20 (1989)—is readily distinguishable. *Hallstrom* concerned 42 U.S.C. § 6972(b)(1), which provides that "[n]o action may be commenced under [a subsection of the statute] . . . (1) prior to sixty days after the plaintiff has given notice of the violation (A) to the Administrator [of the EPA]; (B) to the State in which the alleged violation occurs; and (C) to any alleged violator of such permit, standard, regulation, condition, requirement, or order . . . ." *Id.* at 25 (third alteration in original). As the *Hallstrom* Court explained, the language of § 6972(b)(1) "could not be clearer"; it expressly "prohibited" actions "commenced prior to 60 days after notice." *Id.* at 26. In such circumstances, allowing a plaintiff to file a suit within sixty days of satisfying the statute's notice requirements would be contrary to the statute's plain text. Here, by contrast, § 405(u) says nothing about what the SSA or courts should do if the SSA fails to "immediately" initiate redetermination proceedings. The clear statutory mandate evident in *Hallstrom* is therefore absent here.

Second, plaintiffs argue that an agency's failure to comply with a statutory timing requirement may preclude later action "if individuals are 'injuriously affected' by the procedural violation." Pls. Br. at 66 (quoting *French v. Edwards*, 80 U.S. 506, 510 (1871)). The Supreme Court has held since *French* that "nonconstitutional error will be harmless unless the court concludes from the record as a whole that the error may have had a 'substantial influence' on the outcome of the proceeding." *Montalvo-Murillo*, 495 U.S. at 722. Plaintiffs insist that the SSA's failure to act immediately caused them significant harm, and they are likely right. The SSA's delay made it harder for plaintiffs to supplement their administrative records with additional relevant materials and enabled Conn to destroy records. These harms may have had a "substantial influence" on plaintiffs' ability to establish their initial eligibility for benefits long after the initial determination hearings.

However, the Supreme Court has also cautioned courts to consider "the general purpose" of statutes before imposing sanctions that "would undermine the very governmental interests that [the statute] is meant to protect." *Rigsby*, 137 S. Ct. at 443 (citation omitted). As plaintiffs detail extensively in their briefs, "the general purpose" of § 405(u) was to enable the SSA to end fraudulent determinations more quickly than the reopening procedures at that time allowed. *See* Pls. Reply at 20. It thus seems counterintuitive to hold that a failure to reverse fraudulent determinations quickly enough precludes the government from reversing those determinations at all. *Cf. Montalvo-Murillo*, 495 U.S. at 718 ("In our view, construction of the Act must conform to the 'great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided.'" (quoting *Brock v. Pierce Cty.*, 476 U.S. 253, 260 (1986))). Though plaintiffs may have been prejudiced by the SSA's delays, "[r]emedial tools" are likely available other than precluding the government from holding redetermination hearings, *see Rigsby*, 137 S. Ct. at 444—such as, for instance, requiring the government to implement greater procedural protections. We therefore agree with the district courts in *Perkins* and *Carter* that summary judgment in the SSA's favor was appropriate as to this final claim.

## III. CONCLUSION

The Due Process Clause of the Constitution and the Administrative Procedure Act required the SSA to allow plaintiffs an opportunity to show why the medical reports uniformly and entirely disregarded in their redetermination proceedings were not, in fact, tainted by fraud. Because the district courts in the *Perkins* and *Carter* cases reached the opposite conclusion, we **REVERSE** and **REMAND** those cases, in part, for further proceedings consistent with this opinion. Because we agree with the district court's resolution of the Due Process claims in the *Hicks* line of cases, and because we agree with the district courts' resolutions of the Social Security Act claims in the *Perkins* and *Carter* cases, we **AFFIRM** the district courts' judgments as to those issues.

---

**DISSENT**

---

ROGERS, Circuit Judge, dissenting.  Is *Mathews v. Eldridge*, a bedrock of the modern law of procedural due process, still good law?  One would hardly think so from the arguments of plaintiffs that it does not apply in this case, its marginalization by the district court in the *Hicks* case below, and its demotion to backup status by the majority.

I.

In the decade after the Supreme Court recognized in *Goldberg v. Kelly* that the continued receipt of government benefits was a property interest protected by the Due Process Clause, the Supreme Court gave clarity and coherence to that law.  397 U.S. 254 (1970).  First, the Court required, in *Board of Regents of State Colleges v. Roth* and its progeny, the careful identification of a property or liberty interest.  408 U.S. 564 (1972).  Second, in determining whether a particular procedural protection was required, the Court in *Mathews v. Eldridge* balanced the private and governmental interests at stake through the prism of its three-part balancing test. 424 U.S. 319, 334–35 (1976).  Under that approach, a court must weigh "(1) the burdens that a requested procedure would impose on the Government against (2) the private interest at stake, as viewed alongside (3) the risk of an erroneous deprivation of that interest without the procedure and the probable value, if any, of the additional procedural safeguard."  *Kaley v. United States*, 571 U.S. 320, 333 (2014) (citing *Mathews*, 424 U.S. at 335) (quotation marks omitted).  The Supreme Court has applied this analysis, in these terms, in dozens of cases, with remarkable consistency, for over forty years.[1]  There is no hint that it is not good law.  To shunt it aside, or

---

[1]See the following cases where the Supreme Court applied *Mathews v. Eldridge* balancing:  *Nelson v. Colorado*, 137 S. Ct. 1249, 1255–58 (2017); *Turner v. Rogers*, 564 U.S. 431, 444–49 (2011); *Wilkinson v. Austin*, 545 U.S. 209, 224–30 (2005); *Hamdi v. Rumsfeld*, 542 U.S. 507, 529–35 (2004); *City of Los Angeles v. David*, 538 U.S. 715, 716–19 (2003) (per curiam); *Gilbert v. Homar*, 520 U.S. 924, 931–34 (1997); *Heller v. Doe by Doe*, 509 U.S. 312, 330–34 (1993); *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53–59 (1993); *Connecticut v. Doehr*, 501 U.S. 1, 10–18 (1991); *Washington v. Harper*, 494 U.S. 210, 229–36 (1990); *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 320–34 (1985); *Ake v. Oklahoma*, 470 U.S. 68, 77–83 (1985); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542–48 (1985); *Illinois v. Batchelder*, 463 U.S. 1112, 1116–19 (1983); *Hewitt v. Helms*, 459 U.S. 460, 473–77 (1983); *Santosky v. Kramer*, 455 U.S. 745, 758–70 (1982);

to relegate it to an afterthought, or to focus on so-called "long-standing principles of procedural due process that predate the *Mathews* test," baldly defies longstanding foundational Supreme Court precedent.

The plaintiffs' attempt to shift the focus from the application of rock-solid precedent suggests that plaintiffs anticipate losing under that precedent. Indeed, plaintiffs do inexorably lose under the *Mathews v. Eldridge* test. First, while the plaintiffs' property interest in continued benefits is certainly substantial, the district court in *Carter* gave considerable reasons why that harm is categorically limited. *Mathews* makes clear that this weight-of-the-property-interest factor is to be determined categorically, that is, by the nature of the benefits rather than by the individual harm that one plaintiff may suffer. *See Mathews*, 424 U.S. at 340–43. Second, the government has an obviously strong interest in not erroneously restoring Social Security benefits on the basis of evidence from fraudsters. Apart from the dollar loss, the value of the integrity of the administration of government benefits—and the popular perception of integrity—is enormous. Finally, the factual accuracy of eligibility redeterminations is only minimally enhanced by the additional procedural protection sought by plaintiffs and awarded below in *Hicks*. The procedure sought is to require the agency to consider evidence provided by a lawyer and doctor who together have concededly engaged in wholesale fraud against the same agency for the same type of benefits, unless the agency can show that they acted fraudulently *with respect to the particular claimant*. It is fanciful to think that this protection will significantly improve the accuracy of eligibility redeterminations.

The court below in *Hicks*, concededly "avoid[ing]" the *Mathews v. Eldridge* analysis for the major part of its opinion, *see Hicks v. Colvin*, 214 F. Supp. 3d 627, 630–41 (E.D. Ky. 2016),

---

*Schweiker v. McClure*, 456 U.S. 188, 193–200 (1982); *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 27–34 (1981); *Little v. Streater*, 452 U.S. 1, 13–17 (1981); *United States v. Raddatz*, 447 U.S. 667, 677–81 (1980); *Addington v. Texas*, 441 U.S. 418, 425–33 (1979); *Mackey v. Montrym*, 443 U.S. 1, 10–19 (1979); *Parham v. J.R.*, 442 U.S. 584, 599–617 (1979); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 17–21 (1978); *Dixon v. Love*, 431 U.S. 105, 112–115 (1977); *Ingraham v. Wright*, 430 U.S. 651, 675–83 (1977).

Against this phalanx of cases, plaintiffs cite *Dusenbery v. United States*, 534 U.S. 161 (2002), which accepted the Government's suggestion that the Court decide an issue of adequate notice under the longstanding reasonableness framework of *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), rather than *Mathews*. *Dusenbery* is totally inapposite; there is no question that plaintiffs in this case had adequate notice of the asserted property interest deprivation.

boils procedural due process down to an over-simplified principle ("[w]hen the government asserts a fact about someone and that affects her rights, due process provides her a chance to challenge the assertion," *id.* at 634), and then uses the "naked eye" to apply that principle in a way that cannot be reconciled with the analysis mandated by *Roth* and *Mathews*. Here is how this simplification leads to the wrong conclusion: The purported essence of procedural due process is the ability to challenge facts affecting a plaintiff's rights. Whether there is "reason to believe" the prior application was fraudulent is a fact affecting each plaintiff's rights because without it there would have been no redeterminations of eligibility in the first place. Ergo, each plaintiff is entitled to challenge whether there was fraud.

Such reasoning elides the whole carefully wrought structure of procedural due process. Standard due process analysis requires a clear identification of a property interest and the application of the *Mathews v. Eldridge* analysis to the deprivation of *that* interest. In this case there are two determinations, by two different administrative bodies, that affect two distinct interests. First there is the decision that eligibility must be redetermined, and second is the question of eligibility itself. There is no property or liberty interest in the first. The statute provides for a redetermination in certain circumstances that are independent of whether a claimant is eligible for benefits ("reason to believe" fraud on the part of the lawyer and doctor). There is no more a protected property interest in avoiding a redetermination in these circumstances than had the statute provided for random redeterminations or for redeterminations scheduled on a three-year interval. Indeed, plaintiffs do not claim to have a property interest in avoiding a redetermination.[2] Thus, even though the decision to redetermine is obviously a precondition to losing benefits, and therefore "affects her rights" in a colloquial sense, it does not affect the actual determination of eligibility for benefits, which is the property interest properly identified in this case.[3]

---

[2]According to plaintiffs' brief, they "are not requesting an opportunity to challenge the factual basis for OIG's overall investigation, i.e., its claim that Conn committed a general fraud."

[3]This point is not answered by the analogy the majority draws to a hypothetical variation of the *Hamdi* facts. The present case is not analogous to allowing Hamdi the hollow opportunity to contest his ultimate status as an "enemy combatant" but not the underlying fact that he was captured on the battlefield in Afghanistan (a fact all but dispositive of the ultimate question). Apples to apples, the evidentiary exclusion here is like allowing Hamdi a

Here, following ample notice, an administrative law judge terminated plaintiffs' disability benefits (the deprivation) because it determined there was not sufficient evidence of disability in the medical records initially submitted with the application, the new evidence submitted by plaintiffs, and any testimony given (the evidence) after hearing argument from plaintiffs and their counsel (the opportunity to challenge the evidence). That is textbook due process. The question is whether due process requires even more—specifically, an opportunity for plaintiffs to challenge the Inspector General's "reason to believe" that fraud was involved in their original applications, so that they might use the evidence excluded because of that belief. A straightforward balance of the *Mathews* factors says no.

***Private Interest at Stake.*** As *Mathews v. Eldridge* itself makes clear, it is the general nature of the harm, and the types of relief that are generally available, that fix the weight of the property interest at stake. *See* 424 U.S. at 344. Giving short shrift to *Mathews v. Eldridge* makes it easier for plaintiffs to focus on the particular harms to particular plaintiffs resulting from adverse disability determinations. Instead, viewing in generality the stakes to plaintiffs as a class, as the district court below in *Carter* thoughtfully examined, this interest is substantial, but not as substantial as, for instance, the loss of welfare benefits in *Goldberg v. Kelly*, and of course not nearly so portentous as the detention in *Hamdi*.

Here the parties agree that the property interest being deprived is the continued receipt of Social Security by an eligible recipient. But any plaintiff suffering from a current disability can establish a new forward-looking entitlement by filing a new application for benefits. If successful, those monthly payments should make up for the lost benefits going forward. All plaintiffs were informed of this right to submit new applications when they received unfavorable redetermination decisions, and five of the seven plaintiffs who have taken advantage of this right have been approved for benefits.

---

very real and meaningful opportunity to contest before a neutral arbiter his status as an enemy combatant and that he was captured on the battlefield in Afghanistan (and any other fact used to justify his detention)—only requiring that he do so without relying on, say, letters from persons the CIA has reason to believe are affiliated with al-Qaeda, because Congress determined that evidence of that kind is categorically unreliable in determining enemy combatant status.

Plaintiffs may also apply for a waiver of overpayment, so long as they were not at fault for the fraudulent aspects of their prior application and collection of past payments would be inequitable. If granted, an overpayment waiver would relieve plaintiffs of having to pay back the years of benefits they had received before termination, otherwise one of the harshest consequences of an unfavorable redetermination. *See* 42 U.S.C. § 404(b); *see also* 20 C.F.R. §§ 404.501–.502a, 404.506–.512. On a request for a waiver, it is the Commissioner's burden to prove fault, so every plaintiff unaware of the prior fraud should qualify. To this point, waivers have been granted to 98% of Conn-related beneficiaries who have requested one.

Together, an overpayment waiver coupled with a new, prospective benefits award drastically reduce the hardship of deprivation by allowing plaintiffs to retain earlier monthly payments and ensuring continuous benefits save only for the (likely short) period between the end of the old benefits and beginning of the new ones.[4] Of course, these mitigators are not guaranteed—an applicant must qualify for disability benefits to receive a new award and be without fault to obtain a waiver. But the likelihood in general that a genuinely eligible recipient *wrongfully* stripped of benefits will not be able to prove her current disability is small.

These protections are readily available to nearly every plaintiff who would benefit from the additional process sought—and it is those plaintiffs that our inquiry must focus on. These mitigators are not enough to zero out plaintiffs' interest in the receipt of their benefits, but they do go a long way in reducing the degree of deprivation created by an erroneous eligibility determination.[5]

---

[4]One plaintiff, Griffith, experienced no gap in her monthly payments because of the timing of her overpayment waiver and successful new application.

[5]Departing from the standard analysis for procedural due process also risks the incoherent anomaly of looking at the sought procedural protection as the property interest. The property interest in this case, for instance, is the eligible receipt of disability benefits, not the desired procedural protection of permitting evidence from identified fraudsters. Admitting the evidence is instead a proposed procedure asserted to be required under the *Mathews v. Eldridge* balance to protect the property interest in disability benefits. Treating admission of the evidence itself as the protected property interest facilitates unsound reliance on cases like *Goldberg* and *Hamdi* that involved property and liberty interests far weightier than those in *Eldridge* and this case. For this reason, the purported analogies in the rhetorical opening to the *Hicks* opinion below, concerning terrorists and lying employees, are false ones. *See Hicks*, 214 F. Supp. 3d at 630.

***Public Interests at Stake*.** On the other side of the scale rest the weighty public interests in a functioning disability benefits regime free from the taint of fraud and from overly burdensome and costly procedures. Most obviously, there is an enormous public interest in avoiding the taint of fraud on determinations by one of the largest and most significant government benefits programs in the United States. Confidence in the integrity of the system of awarding benefits is crucial to public acceptance of the statutorily imposed obligation of almost all working Americans to pay Social Security taxes on their income. Permitting the award of benefits based on evidence provided by a doctor through a lawyer to an ALJ when all three have concededly conspired, at least in other cases, to defraud the Social Security disability benefits system obviously undermines confidence in the system. Avoiding this is a substantial public interest.

There are also significant administrative costs. As was the case in *Mathews*, the "most visible burden would be the incremental cost resulting from the increased number of hearings." *See* 424 U.S. at 347. Significantly, that cost would "come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited." *Id.* at 348. That burden would be even greater here, where the hearings sought are not run-of-the-mill benefits determinations (which are already provided), but complex evidentiary hearings into wide-ranging fraud schemes. Hearings of this sort would require officials to spend inordinate time testifying over and over again about that Inspector General's investigation into the Conn fraud—time not spent investigating other Social Security frauds.[6]

What is more, grafting these sorts of evidentiary mini-trials onto the redetermination process would thwart Congress's objective of redetermining benefits effectively and immediately. The redetermination process was created to protect the agency from the lasting effects of benefits frauds. But to undo Congress's evidentiary restriction would serve to

---

[6]It is not at all contradictory to say that the Inspector General's "reason to believe" finding is easily and reliably made and yet burdensome to testify about at individualized hearings. The plaintiff-specific findings are reliably made, in part, because they are deduced from the broader investigation into and discovery of the pattern of submitting fraudulent forms of a particular kind. But that also means that the Inspector General would have to present evidence of the broader conspiracy (from which the individualized findings are deduced) to substantiate the specific application of that broader evidence in each and every case.

introduce categorically unreliable evidence back into the redetermination process and risk re-exposing the agency to the continuing effects of fraud. Congress had large-scale frauds like this in mind when it crafted a "streamlined procedure enabling the [Commissioner] . . . to expeditiously terminate fraudulently obtained [disability] benefits." *See* 140 Cong. Rec. H4750-03 (1994) (Stmt. of Rep. Pickle). As did the Commissioner in implementing Congress's statutory design. We should be loath to substitute our own policy considerations for those unquestionably better suited—and constitutionally empowered—to make them. *See Mathews*, 424 U.S. at 349.

Plaintiffs argue that the burden of additional evidentiary hearings cannot be prohibitively heavy considering that the Commissioner provides similar hearings when agency staff—and not the Inspector General—has reason to believe fraud was involved in an application. But the Commissioner's argument does not hinge on the proposition that it would be impossible to provide the hearings, merely that the cost of doing so in these circumstances outweighs the benefits gained. Moreover, the Commissioner has good reason for treating those two scenarios differently—where a law enforcement entity like the Inspector General investigates and forms a reason to believe that fraud occurred, the cost of challenging that determination is higher and the benefit much lower. That is, in part, because Inspector General investigations are often much larger and more complex than their non-law-enforcement counterparts, and also because determinations by a law enforcement entity with investigative expertise serve as a check against arbitrariness and are less likely to be rebutted.

***Risk of Erroneous Deprivation*.** Under a proper application of the *Mathews* balancing test, the additional procedure sought—the ability to present evidence from fraud-tainted sources—is hardly likely to reduce the risk of wrongful deprivation of the (properly identified) property interest at stake—continued receipt of eligible disability benefits. Once again, giving short shrift to the standard procedural due process analysis leads the analysis astray, here by permitting exaggeration of the risk of erroneous deprivation. Once the property interest at issue is properly identified as the loss of disability benefits, and not the avoidance of a redetermination or the use of certain evidence, it becomes clear that little increase in accuracy would result from considering evidence provided by Conn and one of the four conspiring doctors.

In evaluating the risk of erroneous deprivation, we start by evaluating the current administrative process. *See Mathews*, 424 U.S. at 344. The process in place is intuitive and robust. After the Inspector General notified the Commissioner that it had reason to believe that fraud was involved in the applications of some 1,787 applicants formerly represented by Conn, the Administration's Appeals Council internally reviewed each case to determine whether, disregarding the tainted evidence, the record supported the original award. Some two hundred and fifty applications contained sufficient evidence and were unaffected. For the remainder, including plaintiffs, the Appeals Council found insufficient evidence of disability and notified those individuals that further proceedings were required. Those individuals were notified that they could submit new evidence for a second review by the Appeals Council. Following that second review, the cases were submitted to administrative law judges for further evidence gathering, which the Commissioner was statutorily obligated to assist with. Given the time lapse, plaintiffs were permitted to submit new, after-the-fact evidence in lieu of historical medical records so long as the new evidence was relevant to the existence of a disability at the time of the original application. After all of that additional evidence gathering, administrative law judges conducted individualized hearings—at which plaintiffs could testify and were represented by counsel—to determine whether there was sufficient evidence of disability. All told, about 55% of recipients whose Conn-related redeterminations are complete have received favorable decisions.

That is a lot of process. More importantly, it is process designed to minimize the risk that deserving applicants will be wrongly stripped of benefits. Two key features are worth emphasizing. First, the administrative law judge reviews anew all of the evidence from the original application, save only for the single report submitted by one of the crooked doctors. That review is significant because the Commissioner is statutorily charged during the initial stages of review (of the original application) to assist in "develop[ing] a complete medical history" of at least the twelve months preceding the application, including by scheduling consultative examinations where needed. *See* 42 U.S.C. § 423(d)(5)(A), (B); *see also* 20 C.F.R. § 404.1512. The existing case file, then, should paint a detailed picture of the applicant's disability at the time of the initial determination—the very thing at issue on redetermination.

Second, the opportunity to submit new evidence enables plaintiffs to fill in any gaps left open in the existing case file and to provide substitute evidence for any truthful information contained in the excluded reports. Of course, given the lapse of time, it may sometimes prove difficult to find substitute evidence, but those difficulties are eased in two significant ways. First, the earlier development of the case file means that the most relevant medical records should already be available to the administrative law judge. Second, where older records are unavailable, recipients may develop and submit new evidence, along with authority (expert testimony or otherwise) that such evidence bears on the relevant period. For example, a recipient, like Hicks, suffering from a cognitive disability could take an IQ test today and submit the results as evidence of prior disability, since intellectual capabilities generally remain stable throughout life, *see Program Op. Manual Sys.* (POMS) DI 24515.055; *Williams v. Mitchell*, 792 F.3d 606, 620 n.4 (6th Cir. 2015).

Plaintiffs argue that the risk of an erroneous deprivation (from excluding evidence from a tainted combination of sources) is too high because there is too great a risk that, in any one case, the Inspector General might have had no "reason to believe" fraud was involved—meaning evidence was excluded that should not have been. But again, this conflates the risk of wrongfully excluding evidence with the risk of wrongfully terminating benefits. Plaintiffs have a protected interest in only the latter, and the risk of wrongfully excluding evidence is relevant only as it raises a serious risk of wrongfully terminating benefits—and in most cases it does not.

That is because the one-off reports by non-treating physicians that were excluded are weak evidence as a matter of agency regulation.[7] Under those regulations, controlling weight can only be given to evidence from treating physicians. *See* 20 C.F.R. § 404.1527(c)(2). None

---

[7]The majority argues that the risk of erroneous deprivation is too high in these cases because the Commissioner excluded more evidence than the Inspector General had reason to believe was fraudulent. But that is not quite right. In its referral, the Inspector General notified the Commissioner of its reason to believe that "Mr. Conn or his firm submitted pre-completed 'template' Residual Functional Capacity forms purportedly from" one of the four identified doctors. Along with each of those RFC forms, Conn submitted the evaluation notes of those doctors purporting to be the basis for the (fabricated) conclusions in the RFC forms. Thus, based on the referral, the Commissioner excluded these RFC forms and the accompanying examination notes, which together formed a medical report or opinion. It makes no sense to suggest that the Inspector General did not have reason to believe that the evaluation notes submitted along with and serving as the basis of the conclusions contained in the fabricated RFC forms were similarly tainted by fraud.

of the excluded reports were from treating physicians; they were from one-time examining doctors and were probative only to the extent that they were consistent with the plaintiffs' overall medical records. *See* 20 C.F.R. § 404.1527(c)(4). Moreover, even if there were no showing that the physician engaged in fraud with respect to the particular plaintiff, the fact that—as plaintiffs appear to concede—the lawyer, ALJ, and doctors had otherwise conspired in at least some other cases to commit Social Security fraud would—permissibly, and doubtless drastically—reduce their credibility.

Thus, it is simply wrong to say that the exclusion virtually decides the ultimate issue of eligibility. Plaintiffs observe that because they were successful in their initial applications, when they had the reports, and only failed on redetermination, without them, they must be dispositive. But that observation forgets another, rather important, distinction: plaintiffs' original applications were granted by an administrative law judge on the Conn payroll who rubberstamped every application sent his way regardless of the evidence. The point is that any neutral administrative law judge to consider the reports on redetermination would be bound by regulation to afford them little, if any—and in no case, controlling—probative value.

Even assuming the reports might have some probative value, it would remain next to impossible for any plaintiff to rebut the Inspector General's "reason to believe" that fraud was involved—meaning any hearing on that question would be of little practical worth. The statute requires the Commissioner to "disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence." 42 U.S.C. § 405(u)(1)(B). That is a very low bar. Alternatively, plaintiffs would face a very high bar in showing that no such reason exists. Even compelling evidence to the contrary might well fall short of showing that there was no *reason to believe* fraud was involved. Plaintiffs would require the Commissioner to provide evidence specifically tying the fraud to their individual applications, but the low bar does not require even that. Evidence of the conspiracy between Conn and the four corrupt doctors already provides "reason to believe" that each of the reports those doctors submitted at Conn's behest was tainted by fraud. It is difficult to imagine how any plaintiff could ever show otherwise, considering plaintiffs, as victims, likely do not know whether fraud was involved in their own cases.

In Congress's view, it is a feature—not a bug—that this standard is so low. Having a "reason to believe" is not the end, but rather the beginning of the redetermination process, and a more adversarial determination would defeat the gateway function that the standard serves. It is also the type of determination that can be made reliably by a third party without an adversarial hearing. In *Kaley*, for instance, the Court held that the adversarial process "is far less useful to the threshold finding of probable cause," which "by its nature, is hard to undermine, and still harder to reverse." 571 U.S. at 339. That Congress set such a standard suggests it intended a non-adversarial determination from the start.

For its part, the Supreme Court has upheld initial non-adversarial findings by independent third parties as a check *against* arbitrary deprivations. *See, e.g.*, *F.D.I.C. v. Mallen*, 486 U.S. 230, 244–45 (1988). In *Gilbert v. Homar*, for instance, the Court upheld a state procedure that caused the State to suspend an employee upon learning that the employee was charged with a felony. 520 U.S. 924, 926–27 (1997). Rejecting the argument that due process required a pre-suspension hearing, the Court held that the finding of probable cause and bringing of charges "by an independent body [the police] demonstrate that the suspension is not arbitrary." *See id.* at 934. In other words, a third-party finding of fault was enough to trigger the deprivation of a constitutionally protected interest (continued employment), so long as the employee could eventually challenge the ultimate deprivation. The principle applies with even greater force here because the Inspector General's finding does not trigger the deprivation (the termination of benefits), only the redetermination, and like in *Gilbert*, the plaintiffs had the opportunity to challenge the ultimate deprivation.

In sum, the redetermination inquiry asks whether plaintiffs would have been entitled to disability benefits at the time of their original applications had those applications not included evidence tainted by the possibility of fraud. To answer that question accurately and efficiently, an administrative law judge reviews the original claims file (which presents a snapshot of the claimant's medical condition at the time of her original application) and any newly submitted evidence by claimants or their experts and hears argument and testimony. There is little risk of error in that process—which is even further backstopped by judicial review.

Plaintiffs attempt to inject a specter of unpalatable error by citing the risk that outcome-determinative evidence might be wrongfully excluded in any given case. But that risk is practically nonexistent, and not at all improved by the evidentiary hearing sought. First, by regulation the excluded reports are of such little probative value that they could be outcome-determinative in only the rarest of cases. Second, the standard for excluding evidence—a mere "reason to believe" fraud was involved—is nearly irrebuttable. The rare cases do not dictate the amount of process constitutionally due. Considering the robust procedural safeguards in place, plaintiffs are not constitutionally entitled to additional, burdensome process with little real-world value.

In general, due process does not guarantee a right to present evidence of whatever type and in whatever form a party chooses. Even in the context of a criminal trial, a "defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). The right to present evidence must accommodate other legitimate interests, and in determining that balance, federal rulemakers enjoy broad latitude under the Constitution. *See id.*

Here, Congress and the Commissioner balanced plaintiffs' right to introduce evidence with other legitimate interests of ensuring accurate redeterminations based on reliable evidence and facilitating swift, efficient redeterminations in cases of large-scale frauds. In doing so, the federal rulemakers created a blanket prohibition of evidence that the Commissioner or Inspector General has reason to believe is fraudulent and thus unreliable, rather than allow for case-by-case reliability determinations that would be costly and time intensive. To square that prohibition with plaintiffs' right to introduce evidence, the process allows plaintiffs to submit new evidence to substitute for that which was excluded. That approach soundly balances the *Mathews* factors.

Indeed, the evidentiary restriction here is very much like the prohibition of polygraph evidence upheld in *Scheffer*. There, the Court held that a blanket prohibition on the use of polygraph evidence in military trials was reasonable because there was no scientific consensus on the general reliability of that evidence and because case-by-case reliability determinations would be difficult, if not unworkable. *See Scheffer*, 523 U.S. at 310–11. Rather than allow

individual defendants to litigate why *their* polygraph evidence was nonetheless reliable, it was reasonable to exclude that sort of evidence as a matter of course.

*Scheffer* is not distinguishable on the theory that the restriction here depends on a particularized determination that aspects of the plaintiffs' records are tainted by fraud, whereas *Scheffer* involved a blanket prohibition. Such a purported distinction mistakes the nature of the Inspector General's inquiry and the standard for exclusion. The Inspector General developed the necessary "reason to believe" not by engaging in a hyper-particularized analysis of each plaintiff's records but by investigating and uncovering that the four doctors conspired with Conn to submit fraudulent reports. The Commissioner then excluded any reports submitted by one of those doctors at the behest of Conn. The only remotely individualized inquiry was to compile the list of claimants who submitted one of those reports—hardly an exercise requiring adversarial input. In overall function, then, the exclusion here works just like *Scheffer's* blanket prohibition.

It similarly misses the point to argue, in response, that the evidentiary restriction is unreasonable because it may exclude some evidence that was not fraudulent. Congress is free to (reasonably) exclude—*in all cases*—categories of evidence that it determines is inherently unreliable, even if that evidence might be trustworthy *in some cases.* The point is that it is too difficult or time consuming to determine when those cases arise. The Social Security benefits regime incorporates a good example of the principle: by statute, claimants can prove their disability only with evidence incorporating "medically acceptable clinical and laboratory diagnostic techniques." *See* 42 U.S.C. § 423(d)(3). That limitation reflects a policy choice that it is preferable to demand a certain quality of evidence than to determine case by case whether a claimant's non-qualifying testimony is credible. The idea that some accurate, non-qualifying evidence will not be considered is baked into that evidentiary restriction. So too here. Even if some of the excluded reports contain bits of accurate information, Congress has decided that it is better to exclude all of the tainted evidence than to engage in the hard, if not impossible, work of confidently determining which portions are good evidence and which are bad. There is nothing unreasonable—or unconstitutional—about that decision.

In short, a *Mathews v. Eldridge* balancing leads inexorably to the conclusion that there is no procedural due process violation in this case. Disregarding in this case the countless Supreme Court holdings that reaffirm *Mathews v. Eldridge* risks undermining public respect not only for the integrity of the Social Security system, but also for the commitment of the lower courts to follow foundational Supreme Court precedent.

## II.

The Commissioner's redetermination process also survives the two challenges plaintiffs advance under the Administrative Procedure Act. First, plaintiffs argue that the hearings afforded during redeterminations do not live up to the standards of formal adjudications under the APA. That is a non-starter because redeterminations are not formal adjudications under the APA and thus need not meet those requirements. Regardless of whether they must meet those standards, they do.

Second, plaintiffs argue that it is arbitrary and capricious for the Commissioner to allow claimants an opportunity to challenge a "reason to believe" finding by the Commissioner, but not one by the Inspector General or another law-enforcement agency. This too fails out of the gate; plaintiffs have forfeited the argument by not developing it below. In any event, because the Commissioner has a non-arbitrary justification for tailoring the procedures according to the genesis of the "reason to believe" finding, those procedures are not arbitrary or capricious.

## A.

Redeterminations are not formal agency adjudications under the APA and thus need not follow the detailed trial-like procedures the APA requires of formal adjudications. A formal adjudication is an agency adjudication that is statutorily required to be determined "on the record after opportunity for an agency hearing." *See* 5 U.S.C. § 554(a). The statutory language governing redeterminations, subsection 405(u), contains no "on the record" requirement. *See* 42 U.S.C. § 405(u)(1)(A). When there is reason to believe that fraud was involved in a benefits claim, § 405(u) requires the Commissioner to "immediately redetermine the entitlement of individuals" and authorizes the Commissioner to "terminate such entitlement" if the "Commissioner of Social Security determines that there is insufficient evidence to support such

entitlement" "after redetermining pursuant to this subsection." § 405(u)(1)(A), (3). That statutory language is silent as to what procedural shape redeterminations shall take.

With no "on the record" requirement in § 405(u)—the only statutory language expressly governing redeterminations—plaintiffs are forced to look elsewhere in search of their textual hook. According to plaintiffs, the necessary "on the record" requirement appears in § 405(b)(1), which governs the Commissioner's "decisions as to the rights of any individual applying for a payment under this subchapter." They argue that § 405(b)(1) compels an "on the record" hearing and applies to redeterminations under § 405(u). Both steps of that syllogism are shaky.

Contrary to plaintiffs' contention, we have not already held that hearings under § 405(b)(1) are formal adjudications. *See Mullen v. Bowen*, 800 F.2d 535, 536–37 & n.1 (6th Cir. 1986) (en banc). While we did say as much in a footnote in *Mullen*, we did so only in dicta. The issue of whether § 405(b)(1) required an "on the record" hearing was not before us then. The Commissioner does not appear to contest this point on appeal, however.

Even assuming § 405(b)(1) determinations are formal adjudications, that subsection does not govern redeterminations under § 405(u).[8] Section 405(b)(1) governs "decisions as to the rights of any individual applying for a payment under this subchapter." But plaintiffs were not "individual[s] applying for a payment" at the time of their redeterminations; they were recipients. Section 405(u), on the other hand, authorizes the Commissioner to redetermine disability "pursuant to this subsection," meaning § 405(u), without any indication that redeterminations are also subject to § 405(b)(1). Plaintiffs' broader reading fails to account for these textual limitations.

Reading formal-adjudication requirements into § 405(u) would subvert Congress's purpose in amending the statute to authorize streamlined redeterminations in cases of possible fraud. Even before the statute was amended to provide for redeterminations, the Commissioner

---

[8]The Commissioner does argue the point that redeterminations under § 405(u) are not required by § 405(b)(1), *see* Comm'r. Reply at 36–37, quoting *Robertson v. Berryhill*, No. 16-cv-3846, 2017 WL 1170873, at *12 & n.13 (S.D.W. Va. Mar. 28, 2017), for the proposition that no hearing is "mandated by the specific section regarding redeterminations," § 405(u), but that the "redetermination process as implemented by the [agency] nonetheless provides the protections guaranteed by § 405(b)(1)."

was authorized to "reconsider" whether a recipient's disability had ceased, was no longer disabling, or ever existed to begin with—but "only after opportunity for an evidentiary hearing" that is "reasonably accessible" to the recipient. *See* § 405(b)(2)(B). It was this reconsideration process that Congress found "cumbersome and unworkable" in dealing with potential frauds. *See* Staff of Subcomm. on Oversight of the H. Comm. on Ways & Means, 103rd Cong., Rep. on Reforms to Address Supplemental Security Income Fraud and Abuse Involving Middlemen 7 (Comm. Print 1994). The very essence of § 405(u) was to provide the Commissioner a quicker, more effective method of redetermining eligibility in cases of possible fraud. It makes no sense that Congress would supplement the existing unworkable procedures with a redetermination process subject to the same procedural hurdles. That reading would render Congress's 1994 addition of the redetermination process meaningless. The better reading is that redeterminations are not subject to the APA's trial-like requirements for formal adjudications.

In any event, the redeterminations here met those requirements. Plaintiffs fault the Commissioner for (1) imposing a "sanction" based on evidence outside the record, 5 U.S.C. § 556(d); (2) not allowing "such cross-examination as may be required for a full and true disclosure of the facts," *id.*; (3) relying on official notice of a material fact not appearing in the record without providing plaintiffs the opportunity to "show the contrary" of that material fact, *see* § 556(e); and (4) permitting agency employees involved in "investigative or prosecuting functions" to "participate or advise in the [administrative] decision," § 554(d). But each of those complaints fails for much the same analytical reason that plaintiffs' due process challenge fails: each assumes a right to challenge the Inspector General's "reason to believe" finding or conflates that finding with the administrative decision at issue—redetermination of entitlement.

First, the very same rule that prohibits an agency from imposing a "sanction" based on evidence outside the record, requires that the "agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence." *See* 5 U.S.C. § 556(d). In accordance with those rules and Congress's specific mandate in 42 U.S.C. § 405(u)(1)(B), the tainted evidence was excluded from the record on which the agency terminated plaintiffs' benefits. Thus, even if the termination of benefits can be termed a "sanction," the termination

was imposed consistent with § 556(d), because it was based on "consideration of the whole record" before the administrative law judge.

Second, § 556(d) requires cross-examination only "as may be required for a full and true disclosure of the facts," and expressly allows an agency, when "determining claims for money or benefits," to accept only written evidence so long as no party is prejudiced. Plaintiffs do not claim that cross-examination was necessary for a full and true disclosure of the facts concerning the redetermination of their eligibility; they seek to cross-examine the Inspector General about its fraud finding. But plaintiffs are not entitled to any hearing on the Inspector General's finding, much less a formal adjudication, and cross-examination on that finding has nothing to do with a full and true disclosure of the facts considered by the agency in redetermining plaintiffs' eligibility.

Third, the agency did not rest its redetermination on official notice of any material fact not in the record.[9] To say otherwise is yet again to conflate the Inspector General's finding of fraud with the Commissioner's redetermination of eligibility. The agency did not take notice of the Inspector General's finding of fraud in weighing the evidence properly before it. Upon the Inspector General's referral, the tainted evidence was excluded entirely and automatically by statute. The agency's redetermination of eligibility was based on the record before it, which was completely available to plaintiffs.

Fourth, no one from the Inspector General's office participated or advised in the "[administrative] decision" to which plaintiffs would apply the formal-adjudication rules, the redetermination of eligibility. *See* 5 U.S.C. § 554(d). At the risk of sounding like a broken record, the administrative decision at issue is the redetermination of plaintiffs' eligibility for

---

[9]Our 1992 order in *Baker v. Director, Office of Workers' Compensation Programs*, 980 F.2d 729, 1992 WL 361287, at *2 (6th Cir. 1992) (order), is not to the contrary. In *Baker*, we remanded an unfavorable (original) benefits determination because the administrative law judge considered but assigned almost no weight to a medical opinion after deeming the authoring doctor's qualifications unsuitable. *See id.* That was a problem because the record contained no evidence whatsoever of those qualifications. *See id.* Thus, in effect, the ALJ took official notice of non-record facts—the doctor's qualifications—that were material to its decision not to award disability benefits. Here, the ALJ took official notice of nothing because the excluded evidence was never before the ALJ. Unlike in *Baker*, the ALJ did not weigh the reports in question; the decision to exclude the reports was required by statute to maintain the integrity of the substantive decisionmaking process.

benefits, which was decided based on the record before the administrative law judge without any participation or advice from the Inspector General. The Inspector General's referral to the Commissioner for independent redeterminations in no way implicates the concerns underlying § 554(d)—the joining of prosecutor and judge.

## B.

Plaintiffs' remaining APA claim also fails. It is neither arbitrary nor capricious for the Commissioner to shape the agency's internal procedures governing redeterminations according to which entity investigates and finds that there is "reason to believe" fraud was involved in an application. Plaintiffs do not argue that the Commissioner lacks the statutory power to establish procedures to carry out redeterminations. Nor could they, for the statute says nothing about the procedures for redeterminations, *see* 42 U.S.C. § 405(u), and instead empowers the Commissioner to "establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions," *see* § 405(a). It is a "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978). Thus, as plaintiffs appear to concede, so long as the Commissioner has a non-arbitrary justification for tailoring the procedures according to the source of the "reason to believe" determination, those procedures survive challenge. Here, such a justification exists: investigations and referrals by the Inspector General—the law-enforcement component deputized to root out benefits frauds—are sufficiently different from ad-hoc findings by the Commissioner or her staff to warrant differing procedural review.

But that puts the cart before the horse. Plaintiffs forfeited their arbitrary-and-capricious challenge by failing to raise it meaningfully below. At most, plaintiffs made two passing references to the so-called arbitrary procedural distinction the Commissioner drew between Inspector General referrals and internal determinations of fraud. That these perfunctory references cite the statute setting out the arbitrary-and-capricious standard does not make up for plaintiffs' failure to develop these arguments as standalone claims. On the contrary, both references were made in support of *other* claims—once in the context of plaintiffs' due process

challenge, and again in connection with their formal-adjudications argument. Issues cursorily mentioned without any sort of developed argument are routinely deemed forfeited. *See, e.g.*, *Langley v. Daimler Chrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007). Plaintiffs give no reason to look past that forfeiture.

Forfeited or not, the challenge fails. The statute makes perfectly clear that the Commissioner is authorized to establish procedures that it deems appropriate for carrying out the redeterminations. *See* 42 U.S.C. § 405(a). That "delegated power, of course, may not be exercised arbitrarily, but its exercise may not be impeached merely because reasonable minds differ on the wisdom" of a given procedure. *See F.C.C. v. Schreiber*, 381 U.S. 279, 292 (1965). Thus, our task is to ask whether the Commissioner has some non-arbitrary reason for establishing the two sets of procedures, not to weigh for ourselves the competing considerations that went into that decision.

The Commissioner does have a non-arbitrary justification for treating referrals from the Inspector General differently than fraud determinations made by non-investigatory, in-house personnel—namely, the distinct roles and competencies of those decisionmakers. For one, it would impose a significantly greater burden on investigators (than on agency staff or adjudicators) to subject them to countless evidentiary hearings. In part this is because the Inspector General and other law-enforcement officials play no ongoing role in redeterminations after their referral. Thus, to hold evidentiary hearings into their determinations would be to introduce a host of new actors into the redetermination process. And since the Inspector General and law-enforcement agencies are more likely to investigate large-scale frauds, the resulting hearings would often be more complicated and arduous. That is because an understanding of the broader investigation and findings is crucial to reviewing the individual fraud determinations. It makes good sense that the Commissioner would choose not to impose these burdens on the Inspector General, where doing so would divert considerable resources away from the office's statutory mission to investigate and detect benefits fraud.

In contrast, it is also reasonable for the Commissioner to align redetermination procedures following its own findings of fraud with the procedures required for initial

determinations under § 405(b)(1). By its terms, § 405(b)(1) governs initial determinations and not redeterminations. But that does not mean the Commissioner acts arbitrarily by fashioning redetermination procedures that borrow from those used in initial determinations. Because § 405(b)(1) provides for review of the Commissioner's decisions—but not the Inspector General's—it makes sense that redetermination procedures would allow for review of the Commissioner's finding of fraud, but not one by another entity.

It is ironic that plaintiffs fault the agency for providing review of its own findings of fault, when that review is merely a substitute for the check that is inherent in Inspector General referrals—a finding of fault by an independent third party. As discussed earlier, the Supreme Court has held that a finding of probable fault by an independent body demonstrates that a resulting deprivation is not arbitrary, "baseless[,] or unwarranted." *See Gilbert v. Homar*, 520 U.S. 924, 934 (1997); *see also F.D.I.C. v. Mallen*, 486 U.S. 230, 244–45 (1988). Thus, plaintiffs benefited from a procedural protection that claimants whose "reason to believe" determination was made by the Commissioner were not afforded. If anything, then, the ability to review the Commissioner's finding levels the procedural protections afforded to each set of claimants.

Far from arbitrary, the Commissioner's procedural choices are reasonable and further rather than hinder the congressional mandate to detect benefits fraud and terminate improper awards more efficiently and effectively.

## III.

I join Part II.C. of the majority opinion, but otherwise dissent. The agency's actions challenged in this case do not violate procedural due process or the Administrative Procedure Act.